IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLONY INSURANCE COMPANY,

                Plaintiff,

      v.

VACASA LLC, a Delaware Limited Liability
Company,

                Defendant.

Case No. 3:24-cv-01062-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

This lawsuit arises from an insurance coverage dispute between Plaintiff Colony Insurance Company ("Colony") and its insured, Defendant Vacasa LLC ("Vacasa"). Colony sued Vacasa under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), seeking a declaration that it has no obligation to defend or indemnify Vacasa in an ongoing California state court action.

Colony now moves, pursuant to Federal Rule of Civil Procedure ("Rule") 56(a), for summary judgment on the issues of whether it had any obligation to defend or indemnify Vacasa in the underlying lawsuit. Vacasa cross-moves for partial summary judgment on the issue of

PAGE 1 – OPINION AND ORDER

whether Colony had a duty to defend Vacasa.[1] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court denies Colony's motion for summary judgment and grants Vacasa's motion for partial summary judgment.

BACKGROUND

I.      FACTS

   A.      The Parties

   Colony is a Virginia corporation that sells insurance products and maintains its principal place of business in Illinois. (Compl. ¶¶ 1, 5, ECF No. 1; Def.'s Answer & Countercls. ¶¶ 1, 5, ECF No. 11.) Vacasa is a Delaware limited liability company that manages properties, such as vacation rentals, for third-party owners and maintains its principal place of business in Oregon. (Compl. ¶¶ 2, 9-13 & Ex. A at 22-30; Def.'s Answer & Countercls. ¶¶ 2, 9-13 & Ex. A at 23-31, attaching the relevant Vacasa "Vacation Rental Services Agreement" that third-party owners signed).

---

[1] After the parties participated in a Rule 16 conference, the Court entered a scheduling order bifurcating the parties' motions practice between the duty to defend and duty to indemnify. (ECF No. 17.) Consistent with the Court's scheduling order, Vacasa's motion and response to Colony's motion address only the duty to defend, not the duty to indemnify. (Def.'s Mot. Partial Summ. J. ("Def.'s Mot.") at 1, ECF No. 23; Def.'s Resp. Pl.'s Mot. Summ. J. ("Def.'s Resp.") at 1 n.2, 8, ECF No. 29.) Vacasa also represents (and Colony does not appear to dispute) that Colony has "clarified that its pending motion does not seek a ruling concerning the issue of indemnification." (*Compare* Def.'s Resp. at 8, making this representation, *with* Pl.'s Reply Supp. Mot. Summ. J. ("Pl.'s Reply") at 1-18, ECF No. 30, declining to dispute this representation or further address the duty to indemnify). Given these facts, the Court denies Colony's motion for summary judgment on the duty to indemnify. (*See* Pl.'s Mot. Summ. J. ("Pl.'s Mot.") at 2, ECF No. 21, seeking a declaration "as a matter of law" on Colony's first claim for relief and with respect to Colony's duty to defend and indemnify). The Court notes that Colony may renew the issue of its duty to indemnify at a later stage and in accordance with the Court's scheduling order.

### B.    The Policy

Vacasa purchased a commercial general liability ("CGL") insurance policy (the "policy") from Colony. (*See* Decl. Stephen Weingold Supp. Def.'s Mot. Partial Summ. J. ("Weingold Decl.") ¶ 3 & Ex. B at 7, 10-11, ECF No. 24, detailing the total premium). The policy covered the period from March 5, 2022 to June 15, 2023. (*See id.* Ex. B at 7, ECF No. 24, listing the policy period; Decl. Andrew Lauersdorf Supp. Pl.'s Mot. Summ. J. ("Lauersdorf Decl.") ¶ 3 & Ex. 1 at 1-90, ECF No. 22, attaching the policy "in effect between March 5, 2022, and June 15, 2023").

The policy provides that Colony "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."[2] (Weingold Decl. Ex. B at 13.) The policy also provides that Colony "will have no duty to defend the insured against any 'suit' seeking damages for . . . 'property damage' to which this insurance does not apply." (*Id.*) In its "Definitions" section, the policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . ; or . . . [l]oss of use of tangible property that is not physically injured." (*Id.* at 25, 27) (simplified). The policy adds that "[a]ll such loss of use shall be deemed to occur at the time of the physical injury [or 'occurrence'] that caused it," and that "electronic data is not tangible property." (*Id.* at 27.)

With respect to the applicability of insurance coverage, the policy provides that the "insurance applies to  . . . 'property damage' caused by an 'occurrence' that takes place in the

---

[2] Vacasa's counsel's declaration includes page numbers in the bottom-right corner that appear to correspond to the filing's running page total (i.e., "Page 40" is the Exhibit B cover page and first page of ECF No. 24-2, because it follows counsel's three-page declaration and thirty-six-page Exhibit A, which are respectively located at ECF Nos. 24 and 24-1). (*See* Weingold Decl. at 1-3, Ex. A at 1-36 & Ex. B at 1; *cf.* Def.'s Mot. at 4 n.3, 7, citing the running page total).

'coverage territory' only if [three requirements are satisfied[.]"[3] (*Id.* at 13, 46.) First, the "property damage" must "[o]ccur[] on the premises shown in the [policy's] Schedule or the grounds and structures appurtenant to those premises[,] or . . . [a]rise[] out of the project or operation shown in the Schedule[.]" (*Id.* at 46.) Second, the "property damage" must "occur[] during the policy period[.]" (*Id.*) Third and finally, "no insured listed under [the policy] . . . [can] kn[o]w [before the policy period] that the . . . 'property damage' had occurred, in whole or in part."[4] (*Id.*)

The policy's aforementioned "Schedule" describes the "premises" as (1) "[a]ll office locations owned by the Named Insured or occupied by the Named Insured with written lease agreements per [the] schedule of locations reported to Colony," (2) "[a]ll hospitality locations and HOA/COA locations managed by the Named Insured with a written management contract per [the] schedule of locations reported to Colony," and (3) "[a]mendment of locations to be reported semi-annually [to Colony]." (*Id.*) (simplified). The policy's "Schedule" also describes

---

[3] The policy defines "[c]overage territory" as, among other places, "[t]he United States of America (including its territories and possessions), Puerto Rico and Canada," and an "[o]ccurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Weingold Decl. Ex. B at 25, 27.) Neither definition is in dispute. (*See* Pl.'s Resp. Def.'s Mot. Partial Summ. J. ("Pl.'s Resp.") at 7, ECF No. 27, stating as much).

[4] "Insurance policies . . . sometimes include 'endorsements.'" *Richelson v. Liberty Ins. Corp.*, 796 F. App'x 277, 279 (6th Cir. 2020). "Generally speaking, an endorsement is an amendment to an insurance contract which impacts the scope of coverage of the policy in some way." *Id.* (citing *Endorsement*, BLACK'S LAW DICTIONARY (9th ed. 2009)). Vacasa's policy includes an endorsement titled "Limitation of Coverage to Designated Premises, Project or Operation." (Weingold Decl. Ex. B at 46) (simplified). This endorsement consists of the "Schedule" referenced above and described below and a provision that "modifies" the CGL coverage part by "replac[ing]" "paragraph 1.b. under Section I [of] Coverage A – Bodily Injury and Property Damage Liability[.]" (*Id.* at 13, 46) (simplified). Colony refers to this form as the "LOC Endorsement." (*See* Pl.'s Resp. at 4-7, 17, 19; Pl.'s Reply at 13-15; Def.'s Reply Supp. Mot. Partial Summ. J. ("Def.'s Reply") at 1 n.2, ECF No. 31, quoting Pl.'s Resp. at 4 or ECF No. 27 at 10.)

the "project or operation" as including various "premises" that the named insured owns, leases, or manages:

> Premises that are owned or leased to the named insured. Premises managed by them in the performance of property management services. Operation and maintenance of amenities [and] common areas including lobbies, offices, front desks, clubhouse, banquet halls, game rooms, restaurants, fitness centers, pools, sport courts, laundry, [and] rooms. Excluding habitational use of hotel, condos, timeshare, [and] resort units. This limitation does not apply to an occurrence that is related to the act of conducting business by the insured, on or behalf of the insured as related to the insured's operation that does not take place at a scheduled location.

(*Id.*) (simplified).

The "Schedule" concludes by stating that "[i]nformation required to complete this Schedule, if not shown above, will be shown in the Declarations."[5] (*Id.*) Like the "Schedule," the policy's declarations encompass "all locations on file" (i.e., reported semi-annually) to Colony. (*See id.* at 7, describing "common policy declarations," such as the insured's name and address under item "1." and policy period, and incorporating by reference the "schedule of forms and endorsements" in addressing the "forms applicable to all coverages"; *id.* at 8-9, listing the schedule of forms and endorsements, including CGL "coverage part declarations"; *id.* at 10-11, demonstrating that the CGL "coverage part declarations" describe the policy limits, identify $42,919.00 of the $162,492.00 in "advance premium" as attributable to "real estate property managed," and suggest that instead of being the "same as Item 1" in terms of the "[l]ocation of

---

[5] "The term 'declarations' . . . is an unambiguous reference to a page of the policy itself." *Bergmann v. Hutton*, 101 P.3d 353, 359 (Or. 2004). "In common parlance, it is the first page of an insurance policy and summarizes the terms of that policy, including, among other things, setting out the insurer's limit on liability." *Id.*

all premises you own, rent, or occupy," the policy covers "[a]ll locations on file with Co[lony]")

(simplified).[6]

In addition to these provisions, the policy contains several "[e]xclusions" from coverage,

including, as relevant here, "j. Damage to Property." (*Id.* at 14, 16) (simplified). This exclusion

precludes coverage for "[p]roperty damage" to certain "[p]ersonal" or "particular part[s]" of

property:

> This insurance does not apply to . . . "[p]roperty damage" to:
>
>     . . . .
>
> (4)    Personal property in the care, custody or control of the insured;
>
> (5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.[7]

(*Id.* at 14, 16-17; *see also* Compl. ¶¶ 20, 22-24 & Pl.'s Mot. at 6-12, quoting and invoking these

exclusions).

Relatedly, the policy also contains endorsement titled "Real Estate Property Managed"

("REPM"), which modifies the policy's CGL "liability coverage part" in two ways, including by

---

[6] The policy provides that the "words 'you' and 'your' refer to the Named Insured Shown in the Declarations, and any other person or organization qualifying as a Named Insured under th[e] policy," and that "[t]he words 'we,' 'us' and 'our' refer to the company providing th[e] insurance." (Weingold Decl. Ex. B at 13; *see also id.* at 5-7, identifying the parties as the insurer and insured).

[7] The policy defines "[y]our work" as (1) meaning "[w]ork or operations performed by you or on your behalf[,] and . . . [m]aterials, parts or equipment furnished in connection with such work or operations," and (2) including "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work[,'] and . . . [t]he providing of or failure to provide warnings or instructions." (Weingold Decl. Ex. B at 28.)

"add[ing]" the following provision to the "j. Damage to Property" exclusion: "This insurance does not apply to . . . '[p]roperty damage' to . . . [p]roperty you operate or manage or as to which you act as agent for the collection of rents or in any other supervisory capacity." (Weingold Decl. Ex. B at 52) (simplified). The REPM endorsement also modifies the CGL liability coverage part by "add[ing]" the following "excess insurance" provision to "[p]aragraph 4.b.(1) . . . of Section IV – [CGL] Conditions": "With respect to your liability arising out of your management of property for which you are acting as a real estate manager, this insurance is excess over any other valid and collective insurance available to you, whether such insurance is primary or excess." (*Id.*; *see also id.* at 23-24, setting forth paragraph 4.b.(1) of Section IV under the CGL liability coverage part).

### C.    Underlying Events

Effective April 2, 2021, Vacasa and Rick and Andrea Quosig (the "Quosigs") entered into a Vacation Rental Services Agreement (the "VRS Agreement"), setting forth the terms and conditions under which Vacasa would provide "vacation rental services" for a home that the Quosigs owned in Arnold, California. (*See* Weingold Decl. Ex. A at 16, 28-30, 34, stating that the "Effective Date" "shall be the date of the latest signature or electronic acceptance," and the services were "for the property" located at a California address but defined as "the '[h]ome'") (simplified).

Under the VRS Agreement, the Quosigs authorized Vacasa to market the Quosigs' rental home, process guests' reservations, collect payments and taxes, manage the rental price and guest relations, arrange and collect guests' fees for cleaning services, prepare monthly account statements, and perform or "arrange on [the Quosigs'] behalf and at [the Quosigs'] expense ordinary maintenance, repairs, and services for the [h]ome," which could not exceed $100.00 absent an "[e]mergency [r]epair" or the Quosigs "specifically authoriz[ing]" the "expense."

(*Id.* at 28.) The VRS Agreement, however, provided that the Quosigs were responsible for furnishing at their "expense suitable equipment, appliances, furniture, and furnishings necessary for rental occupancy," and "all appropriate utilities for the [h]ome, including but not limited to gas, electric, sewer, water, cable, internet, trash removal, and pest or termite control as needed." (*Id.* at 29.)

Further, the VRS Agreement provided that it did not "change[] [the Quosigs'] title to, or general rights and obligations of ownership in, the [h]ome." (*Id.* at 30.) The VRS Agreement added that unless otherwise noted, the Quosigs were "at all times . . . fully responsible for all physical, legal, and financial matters pertaining to the [h]ome whether it [was] rented or not[.]" (*Id.*) The Quosigs' responsibilities included, but were not limited to, "the cost of all repairs, maintenance, and replacement of any and all furnishings, fixtures and equipment necessary to maintain the [h]ome in a suitable condition for rental occupancy," any "financial matters associated" with the Quosigs' ownership of the home, and "ensuring that the [h]ome [was] in compliance with applicable law, and regulation, deed restriction, or homeowners' association bylaw or rule." (*Id.*)

The VRS Agreement also included clauses pertaining to potential legal proceedings, claims, and liability, such as indemnification and limitation-of-liability clauses. (*Id.* at 32-33.) The indemnification clause provided, in relevant part, that the Quosigs were "not required to indemnify, defend, or hold harmless any Vacasa [p]arty with respect to any [c]laims solely and directly caused by the Vacasa [p]arty's gross negligence, intentional misconduct, or fraud." (*Id.* at 33.) The limitation-of-liability clause, on the other hand, provided that the "Vacasa parties' liability to [the Quosigs] for breach of contract or negligence[] shall not exceed, in the aggregate, the total management fee received by Vacasa under [the VRS] Agreement during the

twelve-month period immediately prior to the event giving rise to the liability." (*Id.*) (all caps omitted).

On March 22, 2022, less than a year after Vacasa and the Quosigs entered into the VRS Agreement and during the period in which the policy that Colony issued to Vacasa was in effect, an oven broiler fire broke out and spread throughout the Quosigs' property, causing more than $1.5 million in damage. (*Id.* at 3-4, 13, 18, 22, 25-26, 28-30, 34; *id.* Ex. B at 7; Lauersdorf Decl. ¶ 3.)

The following year, the Quosigs and the Quosigs' property insurer, California Fair Plan Association ("CFPA"), filed the underlying lawsuit against Vacasa in the Superior Court of California for the County of Calaveras (the "*Quosig* Lawsuit").[8] (*See* Weingold Decl. Ex. A at 2-3, 11, assigning case number 23-cv-46841 and citing the CFPA policy). CFPA and the Quosigs asserted negligence, breach of contract, and private nuisance claims against Vacasa under California law and jointly sought to recover at least $1,555,340.81 in "total damage[s] . . . to date . . . [and] increasing daily."[9] (*Id.* at 2-4, 11, 15-17, 20, 24-26; *see also id.* at 33, "This [VRS] Agreement will be construed in accordance with and governed by the substantive law of the state

---

[8] The Court's opinion addresses the second amended complaint that the Quosigs and CFPA filed in the *Quosig* Lawsuit. *See* Second Am. Compl. at 1-26 & Ex. A at 1-9, *Cal. Fair Plan Ass'n v. Vacasa LLC*, No. 23-cv-46841 (Calaveras Cnty. Sup. Ct. filed Oct. 25, 2024) (attaching the VRS Agreement as Exhibit A to the Quosigs and CFPA's second amended complaint). The parties "agreed to use" and treat this pleading as "operative . . . in their summary judgment motions." (*See* Def.'s Mot. at 4 n.2; Pl.'s Mot. at 3 n.3, stating or demonstrating as much).

[9] CFPA and the Quosigs' alleged damages consisted of (1) the $802,574.33 that the CFPA paid on the Quosigs' behalf and sought to recover from Vacasa "by way of . . . subrogation claim[s]," and (2) the Quosigs' $752,766.48 in out-of-pocket losses, which were not covered under or beyond the limits of their CFPA policy. (Weingold Decl. Ex. A at 13-15, 18-20, 23-26) (simplified).

in which the [owners' rental] [h]ome is located, without regard to that state's conflict of law rules.").

In support of their claims, CFPA and the Quosigs alleged that on March 22, 2022, Vacasa's "unqualified maid" was cleaning the Quosigs' rental home and "used a combustible oven cleaning fluid . . . in the broiler space of the cooking range[.]" (*Id.* at 4, 11, 16, 21.) After the cleaning fluid flowed into the vent holes of the oven's bottom panel, Vacasa's maid turned the oven "ON" and the fluid's "vapors . . . ignited an uncontrolled fire inside the broiler[.]" (*Id.*) The fire quickly "ignited the surrounding/nearby combustibles on both sides of the [oven's] range . . . [and] spread throughout the [Quosigs'] rental property, which resulted in extensive damage[.]" (*Id.*) Citing an origin-and-cause expert's site inspection and report and engineering expert's site inspection and report and "destructive laboratory inspection" and supplemental report on the testing of items "collected as potential evidence, including the subject range," CFPA and the Quosigs alleged that the "fire loss incident" at the Quosigs' rental home was "caused by [Vacasa's] improper management, maintenance, and supervision, . . . [i]nclu[ding] of the unqualified maid who improperly cleaned the [Quosigs'] oven[.]" (*Id.* at 4-5, 7, 10-13, 16-18, 21-22.)

Attaching, relying on, and at times quoting provisions of the VRS Agreement that Vacasa and the Quosigs executed on April 2, 2021, CFPA and the Quosigs further alleged that Vacasa was "contractually hired to manage, maintain, and supervise" the Quosigs' rental home, Vacasa had "a duty to keep" the Quosigs' rental home in "a safe condition," Vacasa's duties included "hiring, supervising and training competent cleaning persons/maids," and Vacasa breached its duties to the Quosigs by, among other things, failing to manage and maintain the Quosigs' rental home, failing properly to "train and supervise its employees by allowing an unqualified maid to

attempt to clean the subject stove," and failing properly to "train and supervise its cleaning persons/maid so as to prevent an egregious fire loss incident from occurring." (*Id.* at 11-13, 16-18.) CFPA and the Quosigs added that Vacasa's acts and/or omissions and breach of its duties "amounted to not only negligence but also gross negligence and willful misconduct," and that Vacasa "willfully and wantonly breached" its VRS Agreement with the Quosigs. (*Id.* at 11-13, 16-18.)

## II.    PROCEDURAL HISTORY

After rejecting Vacasa's tender of the *Quosig* Lawsuit for defense and indemnity, Colony filed this action against Vacasa on June 28, 2024, invoking the Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1), and seeking a declaration under 28 U.S.C. § 2201 that it had no duty to defend or indemnify Vacasa in the *Quosig* Lawsuit.[10] (*See* Compl. ¶¶ 8, 18, 26 & *id.* at 9; Def.'s Answer & Countercls. ¶¶ 8, 18, 26, listing the filing date and alleging and admitting these facts).

On August 2, 2024, Colony filed Vacasa's waiver of formal service of process, which required Vacasa to file and serve an answer or Rule 12 motion within sixty days of July 9, 2024. (ECF Nos. 5-6, 8.) Vacasa timely answered Colony's complaint on September 9, 2024, and counterclaimed seeking a declaration that Colony was obligated to defend Vacasa in the *Quosig* Lawsuit, asserting that Colony breached the policy by failing to do so and instead claiming that exclusions exempted Colony from any obligation to defend or indemnify Vacasa in the *Quosig*

---

[10] The parties agreed at the time of filing that CFPA and the Quosigs' first amended complaint, filed on July 27, 2023, was the "operative" pleading in the *Quosig* Lawsuit. (*See* Compl. ¶ 7 & Ex. A at 1-30, attaching and identifying as "operative" the first amended complaint; Def.'s Answer & Countercls. at 2, 6 & Ex. A at 1-31, attaching and relying on the first amended complaint; Pl.'s Answer & Affirmative Defs. Def.'s Countercls. ¶ 5, ECF No. 15, admitting that Vacasa filed an "accurate copy of the operative complaint, with attached exhibit, in the [*Quosig* Lawsuit]").

Lawsuit, and asserting an entitlement to attorney's fees and costs under Oregon Revised Statutes ("ORS") § 742.061(1).[11] (*See* Def.'s Answer & Countercls. ¶¶ 20-28, 31-32, 34-37, 40 & *id.* at 11.)

On September 30, 2024, Colony filed an answer and affirmative defenses to Vacasa's counterclaims. (Pl.'s Answer & Affirmative Defs. Def.'s Countercls. at 8-9.) The next month, on October 22, 2024, the parties appeared before the Court for a Rule 16 conference. (ECF No. 17.) The Court issued a scheduling order that same day, establishing a case management schedule:

> Parties are to seek leave to amend pleadings or add any additional parties or claims by [November 29, 2024]. Dispositive [m]otions on the duty to defend are due by [January 24, 2025]. Discovery is to commence [fourteen] days after the resolution of dispositive motions concerning any duty to defend Vacasa, and [must] . . . be completed in 120 days. Dispositive motions on the duty to indemnify will be due [thirty] days after close of discovery. [The parties'] Joint Alternate Dispute Resolution Report is due by [March 28, 2025].

(ECF No. 17.)

In the days that followed, the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) and Rule 73. (ECF Nos. 18-20.) Colony and Vacasa then timely filed their respective motions for complete and partial summary judgment on January 24, 2025. (ECF Nos. 21, 23.) After the parties completed their briefing and the Court took the parties' motions under advisement, the Court requested and received a supplemental declaration and corporate disclosure statement confirming the citizenship of Vacasa's members and thus that the diversity-of-citizenship requirement was satisfied. (ECF No. 34; Def.'s Suppl. Corp. Disclosure

---

[11] "[ORS] § 742.061 requires an award of fees to an insured when 'recovery exceeds the amount of any tender made by the defendant in [an insurance] action,' and [thus] constitutes a [state] substantive law . . . under the *Erie* doctrine[.]" *Schnitzer Steel Indus., Inc. v. Cont'l Cas. Co.*, No. 14-35793, 2016 WL 3059067, at *1 (9th Cir. May 31, 2016) (first quoting OR. REV. STAT. § 742.061(1); and then citing *In re Merrill Lynch Relocation Mgmt., Inc.*, 812 F.2d 1116, 1119 (9th Cir. 1987))); *see also* OR. REV. STAT. § 742.061(1) ("[A] reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon.").

Statement at 1-3, ECF No. 35; Decl. Sarah Anderson Supp. Def.'s Suppl. Disclosure ¶¶ 1-9, ECF 36.)

## LEGAL STANDARDS

A grant of "[s]ummary judgment is appropriate if there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) (citing *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007)); FED. R. CIV. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

"A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law." *Simmons v. G. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022) (citing *Nat'l Am. Ins. Co. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529, 533 (9th Cir. 1996)); *see also Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) ("A fact is 'material' only if it might affect the outcome of the case[.]" (quoting *Anderson*, 477 U.S. at 248)). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (en banc) (quoting *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020)); *see also Fresno*, 771 F.3d at 1125 ("[A] dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." (quoting *Anderson*, 477 U.S. at 248)).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to, and draw all justifiable inferences in favor of, the

nonmoving party. *See McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019) (per curiam) ("The court views 'evidence in the light most favorable to the nonmoving party,' to determine 'whether genuine issues of material fact exist.'" (quoting *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014))); *Brown*, 82 F.4th at 874 ("When determining whether a genuine issue of material fact exists, [courts] 'must draw all justifiable inferences in favor of the nonmoving party.'" (quoting *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1189 (9th Cir. 2021))). In doing so, courts "may not judge credibility, weigh the evidence, or resolve factual disputes[.]" *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 437 (9th Cir. 2023) (citing *Anderson*, 477 U.S. at 255).

## DISCUSSION

The parties filed cross-motions for summary judgment under Rule 56. (Pl.'s Mot. at 2; Def.'s Mot. at 1.) As discussed, *see supra* n.1, resolution of the parties' motions turns on a single question of law: Whether Colony had a duty to defend Vacasa under the policy.[12] *See Allianz Glob. Risks v. ACE Prop. & Cas. Ins. Co.*, 489 P.3d 115, 118 (Or. 2021) (stating that "whether defendant insurers ha[ve] a duty to defend [insureds] under their policies is a question of law for the court").

///

///

///

---

[12] The Court has diversity jurisdiction over this insurance coverage dispute and, therefore, "must apply Oregon law to interpret the [p]olicy." *Or. Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1068 (9th Cir. 2023) (citing *Alexander Mfg., Inc. Emp. Stock Ownership Plan & Tr. v. Ill. Union Ins. Co.*, 560 F.3d 984, 986 (9th Cir. 2009)); *see also Pranger v. Or. State Univ.*, No. 23-35393, 2024 WL 3326068, at *1 n.1 (9th Cir. July 8, 2024) ("In [a] diversity action, [a federal court] appl[ies] the law of the forum state, here Oregon." (citing *Or. Clinic, PC*, 75 F.4th at 1068)).

I.    APPLICABLE LAW

A.    Distinct and Independent Duties

"When an insured purchases an insurance policy that protects against liability, the insurer typically agrees to assume multiple duties to the insured." *W. Hills Dev. Co. v. Chartis Claims, Inc.*, 385 P.3d 1053, 1055 (Or. 2016). In most cases, an "insurer agrees to pay the insured for any liability that is covered by the policy (up to the policy limits)." *Id.* This "contractual obligation is known generally as the duty to indemnify." *Id.* (first citing *Bresee Homes, Inc. v. Farmers Ins. Exch.*, 293 P.3d 1036, 1038 (Or. 2012); and then citing *Ledford v. Gutoski*, 877 P.2d 80, 85 (Or. 1994)); *see also Allianz*, 489 P.3d at 118 ("In order for the duty to indemnify to arise, the insured must be liable for harm or injury that is covered by the policy." (quoting *Ledford*, 877 P.2d at 85)).

"Another important duty commonly found in liability policies is an agreement to defend the insured in legal actions involving claims covered by the policy." *W. Hills Dev. Co.*, 385 P.3d at 1055. This "contractual obligation is known generally as the duty to defend." *Id.* (citing *Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*, 380 P.3d 916, 923 (Or. 2016)). When an insurer is obligated to defend its insured, the insurer provides attorneys to represent the insured, "the insured relinquishes control over the defense . . . , and a fiduciary relationship is created between the insured and insurer that exists independent of the insurance contract." *Fountaincourt*, 380 P.3d at 924 (citing *Georgetown Realty v. The Home Ins. Co.*, 831 P.2d 7, 14 (Or. 1992)).

Although the duties to defend and indemnify "both turn on the terms of the policy," they are "distinct" and "independent" contractual obligations. *See W. Hills Dev. Co.*, 385 P.3d at 1055 (explaining that the "two duties are independent" even though "both duties turn on the terms of the policy" (first citing *Bresee Homes, Inc.*, 293 P.3d at 1038; and then citing *City of Burns v.*

*Nw. Mutual*, 434 P.2d 465, 468 (Or. 1967)); *Allianz*, 489 P.3d at 118 (recognizing that the "standard set out in [Oregon Supreme Court precedent] treats the duty to defend and the duty to indemnify as distinct" (citing *Ledford*, 877 P.2d at 82, 84-85)). Thus, there may be situations in which an insurer has a duty to defend, but not a duty to indemnify, because a trial results in a verdict that the policy does not cover.[13] *W. Hills Dev. Co.*, 385 P.3d at 1055 (citing *ZRZ Realty v. Beneficial Fire & Cas. Ins.*, 241 P.3d 710, 728-29 (Or. 2010), *modified on other grounds*, 249 P.3d 111, 112-13 (Or. 2011)). Conversely, there may also be situations in which an insurer has a duty to indemnify, but not a duty to defend, because a trial results in a judgment that the policy covers.[14] *Id.* (first citing *Ledford*, 877 P.2d at 84; and then citing *City of Burns*, 434 P.2d at 467-68).

### B.    The "Four-Corners" Rule

As discussed, whether an insurer has a duty to defend its insured in an underlying lawsuit is a "question[] of law." *Marleau v. Truck Ins. Exch.*, 37 P.3d 148, 152 (Or. 2001). To answer that question, courts typically apply the "four-corners" rule (also known as the "eight-corners"

---

[13] Vacasa asserts that the *Quosig* Lawsuit is "not yet resolved and the circumstances of a potential claim for indemnification are therefore not yet known." (Def.'s Answer & Countercls. at 5.)

[14] Further, there may be situations in which the "same interpretation" controls both the duties to defend and indemnify. *See Tomas v. Allstate Indem. Co.*, No. 24-2558, 2025 WL 1662745, at *1 (9th Cir. June 12, 2025) ("Although the duty to indemnify is distinct from the duty to defend under Oregon law, . . . here both duties are controlled by the same interpretation of the scope of coverage provided by the policy. . . . Because the state court's decision in the first case regarding the duty to defend was wholly premised on an interpretation of (non)coverage under the policy, the district court properly concluded that the coverage issue was already resolved in the first lawsuit, could not be relitigated, and thus [the insurer] had no duty to indemnify [the insured]." (first citing *Ledford*, 877 P.2d at 82-85; and then citing *Twigg v. Admiral Ins. Co.*, 525 P.3d 478, 485 (Or. Ct. App. 2023), *overruled on other grounds*, 568 P.3d 156 (Or. 2025))).

rule).[15] *See W. Hills Dev. Co.*, 385 P.3d at 1054-55 (applying and describing the "widely accepted 'four-corners' rule," which "refers to the four corners of the complaint" but is also known as the "eight-corners rule (for the four corners of the complaint plus the four corners of the policy)") (simplified); *see also Allianz*, 489 P.3d at 118 (noting that "[t]he question whether [an] insurer is required to defend [its insured] against particular claims depends on the policy and allegations in the complaint asserting the claims—the 'four-corners' and 'eight-corners' rules") (simplified).

Under the four-corners rule, courts "compare[] the allegations in the complaint to the insurance policy's term."[16] *W. Hills Dev. Co.*, 385 P.3d at 1055 (first citing *Bresee Homes, Inc.*, 293 P.3d at 1039; then citing *Marleau*, 37 P.3d at 152; and then citing *Ledford*, 877 P.2d at 82). At the same time, courts "exclud[e] the consideration of evidence outside the 'four corners' of the policy itself." *Allianz Glob. Risks v. ACE Prop. & Cas. Ins. Co.*, 483 P.3d 1124, 1138 (Or. 2021) (quoting *W. Hills Dev. Co.*, 385 P.3d at 1055), *modified on other grounds*, 489 P.3d at 117-19.

///

---

[15] "Ordinarily, courts decide whether an insurer had a duty to defend by [applying the four-corners rule.]" *W. Hills Dev. Co.*, 385 P.3d at 1054 (citing *Bresee Homes, Inc.*, 293 P.3d at 1039). The Oregon Court of Appeals, however, has identified an inapplicable "exception to the four-corners rule, allowing extrinsic evidence . . . to show that a putative insured . . . occup[ied] insured status and therefore was entitled to a defense." *Id.* at 1056 (citing *Fred Shearer & Sons, Inc. v. Gemini Ins. Co.*, 240 P.3d 67, 71-74 & n.9 (Or. Ct. App. 2010), *rev. denied*, 249 P.3d 123 (Or. 2011)).

[16] The parties do not dispute that under the four-corners rule, the Court may consider the terms of the VRS Agreement that CFPA and the Quosigs attached to the operative complaint in the *Quosig* Lawsuit. (*See* Pl.'s Mot. at 3 nn.4-5, 11 n.33, citing Lauersdorf Decl. Ex. 2 at 27-35, i.e., the VRS Agreement; Def.'s Mot. at 4-5, citing and quoting Weingold Decl. Ex. A at 31-33; *see also* Pl.'s Reply at 2, "The facts alleged in the underlying suit, including the contents of the [VRS] . . . [A]greement between [Vacasa] and the Quosigs, are addressed throughout [the motion papers.]").

"In construing the policy to determine whether it gives rise to a duty to defend, [courts] construe the text of the policy as a whole, rather than view particular parts of the policy in isolation." *Bresee Homes, Inc.*, 293 P.3d at 1041 (citing *Hoffman Constr. Co. v. Fred S. James & Co.*, 836 P.2d 703, 706 (Or. 1992)); *see also Twigg*, 568 P.3d at 164 (noting that "interpretation of an insurance policy's terms is a question of law" (citing *Hoffman Constr. Co.*, 836 P.2d at 706)). This "principle applies with equal force to the construction of policy endorsements, exclusions, and exceptions." *Bresee Homes, Inc.*, 293 P.3d at 1041. Courts "must determine from [the policy's] terms and conditions what the parties intended the policy to cover." *Marleau*, 37 P.3d at 152 (citing *Hoffman Constr. Co.*, 836 P.2d at 706); *see also Twigg*, 568 P.3d at 164 (recognizing that subject to an inapplicable exception, "every contract of insurance shall be construed according to the terms and conditions of the policy" (quoting OR. REV. STAT. § 742.016(1))).

A court may find that "a particular provision nullifies or limits coverage or that one policy provision controls over another." *Bresee*, 293 P.3d at 1041. Such a finding, however, must "result from the application of familiar principles of interpretation to the policy as a whole, not from an attempt to give particular weight or effect to one provision because it is an exclusion or exception to the policy's coverage." *Id.* at 1041-42. In evaluating competing interpretations, the Oregon Supreme Court "will not accept an interpretation as plausible if [the proposal] conflicts with 'what [it] perceive[s] to be the understanding of the ordinary purchaser of insurance.'" *Twigg*, 568 P.3d at 165 (quoting *Botts v. Hartford Acc. & Indem. Co.*, 585 P.2d 657, 659-60 (Or. 1978)).

Ultimately, "[a]n insurer has a duty to defend if the factual allegations of the complaint, without amendment, state a claim for any offense[, incident, or injury] covered by the policy."

*Marleau*, 37 P.3d at 153; *Bresee Homes, Inc.*, 293 P.3d at 1039 (first citing *Ledford*, 877 P.2d at 83; and then citing *Blohm v. Glens Falls Ins. Co.*, 373 P.2d 412, 414 (Or. 1962)); *see also Fountaincourt*, 380 P.3d at 923 ("An insurer has a duty to defend . . . if the action involves any claim stated against the insured that could impose liability for conduct covered by the policy." (citing *Ledford*, 877 P.2d at 83)). "It is the substance of the complaint, not its form, that is at the heart of the inquiry." *Marleau*, 37 P.3d at 153 (citing *Ledford*, 877 P.2d at 83)). For this reason, a complaint's failure "correctly" to "identify" or separately state a claim does not "defeat[] the duty to defend," nor does the "presence of ambiguity or unclarity in the complaint," or the "inclusion in the complaint of other allegations describing claims that fall outside the policy's coverage." *Bresee Homes, Inc.*, 293 P.3d at 1039 (first quoting *Marleau*, 37 P.3d at 153; then citing *Ledford*, 877 P.2d at 83; and then citing *Abrams v. Gen. Star Indem. Co.*, 67 P.3d 931, 935 (Or. 2003)).

## II.    ANALYSIS

Given the Court's ruling, *see supra* n.1, Colony effectively moves for partial summary judgment, seeking a declaration that it had no duty to defend Vacasa in the *Quosig* Lawsuit. (*See* Pl.'s Mot. at 2.) Vacasa also seeks partial summary judgment on Colony's duty to defend. (Def.'s Mot. at 1.)

### A.    Burden of Proof

"The general rule in Oregon is that the insured, rather than the insurer, bears the initial burden of proving coverage." *Houston Specialty Ins. Co. v. Rodriguez Corp.*, No. 3:18-cv-01886-YY, 2019 WL 7630791, at *5 (D. Or. Oct. 25, 2019) (quoting *QBE Ins. Corp. v. Creston Court Condo., Inc.*, 58 F. Supp. 3d 1137, 1144 (D. Or. 2014)), *findings and recommendation adopted*, 2020 WL 362641, at *1-2 (D. Or. Jan. 22, 2020); *see also Bighorn Logging Corp. v. Truck Ins. Exch.*, 437 P.3d 287, 293 (Or. Ct. App. 2019) ("The insured bears the initial burden of

proving that the allegations . . . assert a claim covered by the policy." (citing *Fountaincourt*, 380 P.3d at 927)). "Conversely, the insurer has the burden of proving that the policy excludes coverage." *Houston Specialty Ins. Co.*, 2019 WL 7630791, at *5 (quoting *Emps. Ins. of Wausau, A Mut. Co. v. Tektronix, Inc.*, 156 P.3d 105, 509 (Or. Ct. App. 2007)); *see also Fountaincourt*, 380 P.3d at 927 ("[T]he insurer . . . has the burden to prove an exclusion from coverage." (quoting *ZRZ Realty*, 241 P.3d at 716)).

"However, when an insurance company brings an action for declaratory judgment, it bears the 'burden of proving noncoverage.'" *Houston Specialty Ins. Co.*, 2019 WL 7630791, at *5 (quoting *QBE Ins. Corp.*, 58 F. Supp. 3d at 1144); *see also Houston Specialty Ins. Co.*, 2020 WL 362641, at *1-2 (Simon, J.) (adopting the magistrate judge's "analysis that in [an insurer's] declaratory judgment action, the burden is on the insur[er] . . . to prove lack of coverage" (first citing *United Pac. Ins. Co. v. Mazama Timber Prods., Inc.*, 527 P.2d 259, 261 (Or. 1974); and then citing *QBE Ins. Corp.*, 58 F. Supp. 3d at 1144)); *United Pac. Ins. Co.*, 527 P.2d at 261 ("[W]hen the insurer brings an action for a declaratory judgment to adjudicate the question of coverage and alleges that no coverage exists, the insurer has the burden of proving why there is no coverage.").

**B.    Disposition**

The Court concludes that Colony has failed to carry its burden of demonstrating noncoverage.

**1.    Proof of Coverage**

CFPA and the Quosigs assert a claim in the underlying complaint that Vacasa's policy covers.

The Court briefly recounts the allegations in the underlying complaint before comparing those allegations to the terms of Vacasa's policy. In the *Quosig* Lawsuit, CFPA and the Quosigs

asserted state law claims against Vacasa for negligence, breach of contract, and private nuisance and jointly sought to recover at least $1,555,340.81 in "total damage[s]," which were "increasing daily." (Weingold Decl. Ex. A at 2-4, 11, 15-17, 20, 24-26.) In support of their claims for relief, CFPA and the Quosigs alleged that on March 22, 2022, Vacasa's "unqualified maid" was cleaning the Quosigs' rental home and "used a combustible oven cleaning fluid . . . in the broiler space of the cooking range[.]" (*Id.* at 4, 11, 16, 21.) After the combustible fluid flowed into the vent holes of the oven's bottom panel, Vacasa's maid turned on the oven and the fluid's "vapors . . . ignited an uncontrolled fire inside the broiler[.]" (*Id.*) The fire quickly "ignited the surrounding/nearby combustibles on both sides of the [oven's] range . . . [and] spread throughout the [Quosigs'] rental property, which resulted in extensive damage[.]" (*Id.*) Citing origin-and-cause and engineering experts' site inspections, reports, "destructive laboratory inspection," and testing of items "collected as potential evidence, including the subject range," CFPA and the Quosigs alleged that the "fire loss incident" at the Quosigs' rental home was "caused by [Vacasa's] improper management, maintenance, and supervision, . . . [i]nclu[ding] of the unqualified maid who improperly cleaned the [Quosigs'] oven[.]" (*Id.* at 4-5, 7, 10-13, 16-18, 21-22.)

In addition to attaching to their operative complaint the VRS Agreement that Vacasa and the Quosigs executed on April 2, 2021, CFPA and the Quosigs relied extensively on the VRS Agreement's terms and Vacasa's role thereunder as the "contracted manager" of the Quosigs' "vacation rental property," and at times quoted the VRS Agreement's provisions. (*See id.* at 3-4, 10-26; *see also id.* at 28-36, attaching the VRS Agreement). CFPA and the Quosigs alleged that Vacasa breached the VRS Agreement and its duty to the Quosigs, among other ways, by failing

properly to "manage" the "subject rental property," as it was "contractually hired" to do. (*Id.* at 11-13, 16-18.)

By comparison, the policy provides that Colony "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."[17] (Weingold Decl. Ex. B at 13.) The policy further provides that the "insurance applies to . . . 'property damage' only if [three requirements are met.]" (*Id.*) First, the "property damage" must "[o]ccur[] on the premises shown in the [policy's] Schedule or the grounds and structures appurtenant to those premises[,] or . . . [a]rise[] out of the project or operation shown in the Schedule[.]" (*Id.*) Second, the "property damage" must "occur[] during the policy period[.]" (*Id.*) Third and finally, "no insured listed under [the policy] . . . [can] kn[o]w [before the policy period] that the . . . 'property damage' had occurred, in whole or in part."[18] (*Id.* at 46.)

The policy's aforementioned "Schedule" describes the "premises" as (1) "[a]ll office locations owned by the Named Insured or occupied by the Named Insured with written lease agreements per [the] schedule of locations reported to Colony," (2) "[a]ll hospitality locations and HOA/COA locations managed by the Named Insured with a written management contract per [the] schedule of locations reported to Colony," and (3) "[a]mendment of locations to be

---

[17] In its "Definitions" section, the policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . ; or . . . [l]oss of use of tangible property that is not physically injured." (Weingold Decl. Ex. B at 25, 27) (simplified).

[18] The policy includes an endorsement titled "Limitation of Coverage to Designated Premises, Project or Operation." (Weingold Decl. Ex. B at 46) (simplified). This endorsement, which includes the "Schedule" referenced herein, "modifies" the "insurance provided under the [policy's] . . . [CGL] coverage part" by "replac[ing]" "[p]aragraph 1.b. under Section I [of] Coverage A – Bodily Injury and Property Damage Liability[.]" (*See id.* at 13, 46) (simplified). As discussed, Colony often refers to this form as the "LOC Endorsement." (*See, e.g.*, Pl.'s Resp. at 4-7, 17, 19.)

reported semi-annually [to Colony]." (*Id.*) (simplified). The policy's "Schedule" also describes

the "project or operation" as including various "premises" that the named insured owns, leases,

or manages:

> Premises that are owned or leased to the named insured. Premises managed by
> them in the performance of property management services. Operation and
> maintenance of amenities [and] common areas including lobbies, offices, front
> desks, clubhouse, banquet halls, game rooms, restaurants, fitness centers, pools,
> sport courts, laundry, [and] rooms. Excluding habitational use of hotel, condos,
> timeshare, [and] resort units. This limitation does not apply to an occurrence that
> is related to the act of conducting business by the insured, on or behalf of the
> insured as related to the insured's operation that does not take place at a scheduled
> location.

(*Id.*) (simplified).[19]

It is undisputed that CFPA and the Quosigs assert a claim in the underlying complaint

that Vacasa's policy covers. (*Compare* Pl.'s Resp. at 4, 7, *with* Def.'s Mot. at 11, *and* Def.'s

Reply at 1 & n.2, 4.) In other words, it is undisputed that the *Quosig* Lawsuit satisfies the three

requirements necessary to trigger coverage under the policy because (1) a fire occurred and

resulted in "property damage" at the Quosigs' rental home (i.e., a "premise[]" that Vacasa

"managed" in the "performance of property management services") on March 22, 2022, (2) the

property damage occurred during Vacasa's policy period, which spanned from March 5, 2022

through June 15, 2023, and (3) Vacasa lacked any pre-policy period knowledge that the fire "had

---

[19] The "Schedule" adds that "[i]nformation required to complete this Schedule, if not
shown above, will be shown in the Declarations." (Weingold Decl. Ex. B at 46.) Like the
"Schedule," the declarations encompass "all locations on file" (i.e., reported semi-annually) to
Colony. (*See id.* at 7, describing "common policy declarations," such as the insured's name and
address under item "1." and policy period, and incorporating by reference the "schedule of forms
and endorsements" in addressing the "forms applicable to all coverages"; *id.* at 8-9, listing the
schedule of forms and endorsements, including CGL "coverage part declarations"; *id.* at 10-11,
demonstrating that the CGL "coverage part declarations" describe the policy limits, identify
$42,919.00 of the $162,492.00 in "advance premium" as attributable to "real estate property
managed," and suggest that instead of being the "same as Item 1" in terms of the "[l]ocation of
all premises you own, rent, or occupy," the policy covers "[a]ll locations on file with Co[lony]")
(simplified).

occurred [or would occur], in whole or in part."[20] (*See id.* at 7, 46, listing the policy period, three requirements, and covered "premises" and "project or operation"; Lauersdorf Decl. ¶ 3, noting that the policy was "in effect between March 5, 2022, and June 15, 2023"; Weingold Decl. Ex. A at 4, 11, 16, 21, asserting claims based on the fire at the Quosigs' vacation rental property on "March 22, 2022").

In responding to Vacasa's cross-motion, Colony admits that these coverage requirements are satisfied:

> Colony does not dispute that LOC Endorsement is part of the [p]olicy, or that it applies. . . .
>
> . . . .
>
> [Nor does] Colony . . . argue[] that the alleged "property damage" was not caused by an "occurrence," did not occur in the "coverage territory," did not occur during the policy period, or did not occur on premises managed by [Vacasa] in the performance of property management services. [Rather,] Colony [argues only that it] has no duty to defend [Vacasa] against the claims alleged in the underlying suit, because multiple *exclusions apply to remove coverage* for the "property damage" alleged in the underlying suit. The LOC Endorsement does not in any way address the exclusions that preclude coverage for the claims alleged in the underlying suit, and [Vacasa's] emphasis on the LOC Endorsement is misplaced.

(Pl.'s Resp. at 4, 7; *see also* Pl.'s Mot. at 9-13, moving for summary judgment based on the exclusions and endorsement addressed below) (emphasis added). Thus, even if Vacasa bore the initial burden of proving coverage, there is no dispute that it has done so. *See Bighorn Logging Corp.*, 437 P.3d at 293 (stating that "[t]he insured bears the initial burden of proving that the

---

[20] The policy also conditions the applicability of coverage on the "property damage" being "caused by an 'occurrence' that takes place in the 'coverage territory[.]'" (Weingold Decl. Ex. B at 46.) The policy defines "[c]overage territory" as, among other places, "[t]he United States of America (including its territories and possessions), Puerto Rico and Canada," and an "[o]ccurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 25, 27.) Neither definition is in dispute. (Pl.'s Resp. at 7.)

allegations . . . assert a claim covered by the policy" (citing *Fountaincourt*, 380 P.3d at 927)); *see also Houston Specialty Ins. Co.*, 2019 WL 7630791, at *5-6 (reflecting that the district court "first consider[ed] whether coverage exist[ed] under the [policy] . . . and, if so, determine[d] whether any exclusions appl[ied]," even though the insurer "brought an action for declaratory judgment, [and thus bore] the burden of proving there is no coverage under the terms of the policy").

### 2.    Exclusions

The pertinent question, then, is "whether an exclusion in an insurance policy relieves an insurer of its duty to defend the insured[, which] depend[s] on the meaning of the exclusion and whether, properly construed, it encompasses all of the allegations made in the complaint that would otherwise give rise to that duty." *Houston Specialty Ins. Co.*, 2019 WL 7630791, at *12 (quoting *Bighorn Logging Corp.*, 437 P.3d at 294). Colony argues that the "multiple exclusions apply to remove coverage for the 'property damage' alleged in the underlying suit." (Pl.'s Mot. at 7.) Specifically, Colony argues that the Damage to Property exclusions j.(4), j.(5), and j.(6) and the REPM endorsement "apply to preclude coverage for the claims, liability, and damages alleged in the underlying suit." (Pl.'s Mot. at 11-12.) The Court disagrees.

### a.    Exclusion j.(4)

Exclusion j.(4) precludes coverage under the policy for "property damage" to "personal property in the care, custody or control of the insured[.]" (Weingold Decl. Ex. B at 14, 16-17) (simplified).

Colony argues that exclusion j.(4) applies and relieves it of its duty to defend Vacasa in the *Quosig* Lawsuit. (Pl.'s Mot. at 10.) In support of this argument, Colony notes that the CFPA and the Quosigs allege that "Vacasa was contractually obligated to exercise care and control over the rental property, and further allege[] that Vacasa and its employee, the maid, had physical

custody and control of the rental property at the time of the fire." (*Id.*) (footnote omitted). Colony adds that courts have recognized that "care, custody, or control exclusions . . . [are] valid and enforceable under Oregon law," citing *Artisan & Trucker Casualty Company v. Finishline Trucking, LLC*, No. 3:20-cv-01762-IM, 2022 WL 420939, at *9 (D. Or. Feb. 11, 2022). (*Id.* at 10 n.26.)

Vacasa responds that Colony's reliance on exclusion j.(4) fails for three reasons: (1) "the 'phrase 'care, custody, or control' in the '[p]ersonal property' exclusion is ambiguous as to the level of control it requires that Vacasa exercise over personal property," (2) the "level of control Vacasa exercised over the property in the Quosig[s'] [rental] home [was] insufficient to trigger th[e] exclusion," and (3) Colony's own "incorrect interpretation" supports that the *Quosig* Lawsuit does not relieve Colony of its obligation to defend Vacasa. (Def.'s Resp. at 9.)

The Court finds the cases upon which Colony relies distinguishable. In addition to *Artisan*, Colony relies on *Crist v. Potomac Insurance Co.*, 413 P.2d 407, 410 (Or. 1966), *Garvison v. St. Paul Fire & Marine Ins. Co.*, 771 P.2d 310, 312 (Or. Ct. App. 1989), and *Stack Metallurgical Services, Inc. v. Travelers Indemnity Co.*, No. 05-cv-01315-JE, 2007 WL 464715, at *27 (D. Or. Feb. 7, 2007). (*See* Pl.'s Mot. at 10 n.26; Pl.'s Reply at 7 & nn.33-37, relying on these cases).

In *Artisan*, the insurer sued its insured under the Declaratory Judgment Act, seeking a declaration that it owed no duty to defend or indemnify the insured under a "commercial automobile policy." 2022 WL 420939, at *1. At the default judgment stage, the district court "consider[ed] whether the allegations in the [insurer's] complaint state[d] a claim that support[ed] the relief sought." *Id.* at *3 (citations omitted). The district court found that the insurer's "allegations support[ed] [its] request for a declaration that it owe[d] no duty to defend

or indemnify in the underlying lawsuit." *Id.* at *4. In support of this finding, the district court noted that the insurer relied on the policy's "exclusion for '[p]roperty damage to . . . any property . . . being transported by . . . or in the care, custody or control of the insured,'" and "[s]uch exclusions have been recognized as valid and enforceable under Oregon law." *Id.* (citing *Schnitzer Inv. Corp. v. Certain Underwriters at Lloyd's of London*, 104 P.3d 1162, 1171-72 (Or. 2005)). The district court added that the allegations in the underlying lawsuit "stemm[ed] from [the insured's] actions while [a portable indoor horse-riding] arena was in their care, custody, and control," and that "even if any of [the] allegations stem[med] from the transportation of the arena from Bend to Hood River County, the exclusion applie[d] to property damage to property in transit." *Id.*

In *Schnitzer*, the plaintiff "own[ed] land in Portland on which it, its predecessors, and previous owners conducted a variety of industrial activities over many decades, resulting in contamination of the land." 104 P.3d at 1165. The "defendants issued a number of insurance policies insuring [the] plaintiff or its predecessors against claims for property damage." *Id.* at 1166. Under the policies "at issue" in *Schnitzer*, the insurer "promised to pay all sums that plaintiff became 'legally obligated to pay as damages' because of 'property damage.'" *Id.* The policies also "contained a number of exclusions from coverage, including an exclusion for property damage to 'property owned or occupied by or rented to the insured[.]'" *Id.* On appeal, the plaintiff "concede[d] that, although the excess policies that various defendants issued use[d] different wording, they also effectively exclude[d] coverage for property that the insured own[ed]." *Id.*

As relevant here, the plaintiff's fourth assignment of error concerned "lost policies" (i.e., policies that the parties were "unable to locate" but the plaintiff "claim[ed] existed"), which

"purportedly contained an 'owned property' exclusion from coverage[.]" *Id.* at 1171. The plaintiff argued that there was "evidence that [certain defendant insurers] agreed to delete the 'owned property' exclusion." *Id.* In support, the plaintiff "relie[d] on the testimony of its controller and chief financial officer . . . , who testified . . . that he insisted that [the relevant defendants] delete from the policies the 'care, custody, and/or control' . . . exclusion from coverage." *Id.* Under this "'care, custody, and/or control' exclusion, damage to property that the insured [did] not own, but that [was] in the insured's care, custody, or control at the time of the damage, [was] excluded from coverage." *Id.* at 1171 n.9. Furthermore, "[t]he paragraph of the form that contain[ed] the 'care, custody, and/or control' exclusion also include[d] the 'owned property' exclusion." *Id.* at 1171. Consistent with the plaintiff's concession that the policies "effectively exclude[d] coverage for property that the insured own[ed]," the Oregon Court of Appeals found that "no reasonable factfinder could determine . . . [the relevant insurer] also deleted the 'owned property' exclusion from the lost policies," and therefore affirmed the grant of summary judgment to the "defendants on [the] plaintiff's lost policy claims." *Id.* at 1166, 1172.

*Artisan* and *Schnitzer* provide no support to Colony in demonstrating that "one or more exclusions in the insurance policy absolve[d] it of [its] duty [to defend]." *Bighorn Logging Corp.*, 437 P.3d at 294 (citing *Fountaincourt*, 380 P.3d at 927). The facts and circumstances in *Artisan* and *Schnitzer* are clearly distinguishable. Further, neither case required an equivalent evaluation of policy terms. Thus, these cases fail to support a conclusion that Colony has met its burden.

*Crist*, *Garvison*, and *Stack Metallurgical Services* are similarly unhelpful. In *Stack Metallurgical Services*, the plaintiff insured operated a facility in Portland that "specialize[d] in

heat-treating metal parts and assemblies for its customers." 2007 WL 464715, at *1. One of the plaintiff's customers, which "manufacture[d] orthopedic castings that [were] implanted in human patients," entered into an agreement with the plaintiff, under which it "purchased heat-treatment processing services" from the plaintiff and approved the plaintiff's use of a "specialized vacuum furnace . . . in the heat-treating process." *Id.* The specialized furnace was located at the plaintiff's facility and the plaintiff used the furnace primarily for treating the customer's products and only when the customer did not need the furnace. *Id.* Consequently, the customer's "medical castings were in [the plaintiff's] care, custody, and control while they were at [the plaintiff's] facility for processing," including when one of the plaintiff's "employees . . . left a hammer containing lead in the vacuum furnace[,] along with parts being processed, [which given] the high temperatures in the furnace[,] . . . caused lead particles to disperse and contaminate [the customer's] parts[.]" *Id.*

Like Vacasa's policy, the CGL policy in *Stack Metallurgical Services* covered "property damage' to which [the] insurance applie[d]," and excluded such damage to "[p]ersonal property in the care, custody, or control of the insured" and "[t]hat particular part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it." *Id.* at *9 (addressing "Section 2.j.(4)" and "Section 2.j.(6)" exclusions). At the summary judgment stage, the district court "agree[d] with the insurer that the "exclusion of coverage for damage to property in plaintiff's 'care, custody, or control' applie[d] because [the customer's] castings were indisputably within [the plaintiff's] 'care, custody, and control' when they were damaged by the lead contamination." *Id.* The district court emphasized that it was the plaintiff's "treatment of the castings, while they were in its custody and control, that damaged the castings." *Id.* Furthermore, the district court "agree[d]" with the insurer and found applicable the policy's "exclusion of

coverage for the damage to a 'part of any property that must be restored, repaired, or replaced' because . . . the insured's work was 'incorrectly performed on it[.]'" *Id.* In finding an exception to this exclusion did not apply, the district court emphasized that the "damage for which [the] plaintiff [sought] . . . recovery occurred in its own furnace at its own premises." *Id.* For these reasons, the district court granted summary judgment in the insurer's favor on the plaintiff's claim. *Id.* at *10.

Thus, *Stack Metallurgical Services* involved the same exclusion but dissimilar facts. Unlike the situation presented here, the situation in *Stack Metallurgical Services* was tantamount to a "bailment." *See Gage v. All Nations Ins. Co.*, 842 P.2d 784, 786 (Or. 1992) ("A commonly accepted definition of bailment is 'a delivery of [property] by one party to another, to be held according to the purpose or object of the delivery, and to be returned or delivered over when that purpose is accomplished.'" (quoting *Kantola v. Lovell Auto Co.*, 72 P.2d 61, 62-63 (Or. 1937))); *cf. Praetorian Ins. Co. v. W. Milling, LLC*, No. 1:15-cv-00557, 2017 WL 4284717, at *4-5 (E.D. Cal. Sept. 27, 2017) (noting, in applying "California law," that "[c]are, custody, or control clauses are intended to except from policy coverage liability on account of damage to property held under bailment") (simplified). That is significant because as a leading treatise on insurance law explains, a court's determination of whether exclusion j.(4) applies depends on case-specific facts:

> The determination of whether property is in the 'care, custody, or control' of the insured depends upon whether the property is realty or personalty; the location, size, and other characteristics of the property; and the insured's relationship to the property, including the insured's duties with respect to the property, nature, and extent of the insured's control over the property and any interest the insured may have in the property.

9 Jordan R. Plitt, Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, *Couch on Insurance* § 126:22 & n.1 (3d ed. June 2025 update) (stating that "[t]his chapter [i.e., Chapter 126]

discusses issues common to 'general' liability policies, defined as liability policies other than those covering automobiles"); *see also* Ken's Foods, Inc. v. Steadfast Ins. Co., 36 F.4th 37, 43 (1st Cir. 2022) (recognizing that "*Couch on Insurance* . . . is a leading treatise regarding insurance law," and that the Massachusetts Supreme Judicial Court has "cited [the treatise] for decades").

The Oregon Court of Appeals' *Garvison* decision is also distinguishable and fails adequately to support Colony's position. In *Garvison*, the plaintiff insureds were in the "business of boarding, training, showing and breeding horses," and "agreed with [a third party] to care for and 'to assume all board [and] training expenses, veterinary, shoeing, entry fees and show expenses' for a horse that he owned." 771 P.2d at 311. After the third party sued the plaintiffs for injuries his horse suffered "under the[ir] care," the plaintiffs filed an action against "their 'farm liability' insurer, seeking a declaratory judgment that it must defend and indemnify them for any damages[.]" *Id.* The plaintiffs' policy covered "personal liability arising out of 'any damage to tangible property of others[,]' . . . [and] 'amounts [the plaintiffs were] legally required to pay for [p]ersonal [l]iability . . . as a result of farming operations [they] perform[ed] for others for a fee under any contract or agreement.'" *Id.* The plaintiffs' policy excluded "'losses which result[ed] from business pursuits,' but provide[d] that 'th[at] exclusion [would not] apply to farming operations.'" *Id.* The policy also excluded "damage to property [that the plaintiffs] or any other protected person own[ed], rent[ed], occup[ied], use[d] or physically control[led.]" *Id.* at 311-12 (simplified).

On appeal, the insurer argued that the trial court erred in determining that the policy's use of the term "physical control" was ambiguous and finding unpersuasive the insurer's understanding of "physical control" and related reliance on the Oregon Supreme Court's decision

in *Ferguson v. Birmingham Fire Ins.*, 460 P.2d 342 (1960). *Id.* at 312. In rejecting the insurer's

assignment of error, the Oregon Court of Appeals distinguished exclusions concerning property

under the "physical control," as opposed to "care, custody or control," of the insured and

emphasized that the insurer's assertions would effectively nullify the coverage provisions and

purpose for which the insureds purchased (and the insurer issued) the "farming operations"

policy:

> In its first assignment, [the] defendant contends that the court erred by
> rejecting its understanding of "physical control." [The] [d]efendant relies on
> *Ferguson* . . . , where the [Oregon Supreme Court] indicated that "physical
> control" exclusions in general liability policies normally apply to business risks.
> The issue [in *Ferguson*] was whether damage to a neighbor's trees, which was
> caused by the insured's timber trespass, came within the exclusion in a general
> liability policy for damages to property under the insured's care, custody or
> control and property over which the insured exercised physical control. The
> [Oregon Supreme Court] rejected the insurer's argument that the trespass brought
> the trees under the insured's physical control. [The Oregon Supreme Court] also
> noted that the meaning of that exclusion "is not to be found in an abstract analysis
> of the word control[; rather, it] must turn to the reasons for the adoption of the
> exclusion clause and determine whether in light of those reasons the policy was
> intended to exclude coverage in the circumstances of the particular case."
> [*Ferguson*, 460 P.2d at 345-46]. The [Oregon Supreme Court] concluded that, in
> the circumstances of [the *Ferguson*] case, the exclusion did not defeat coverage
> for damage that the insured's timber trespass caused when the insured unwittingly
> exercised control over the neighbor's property while engaged in a non-business
> activity.
>
> There are two significant differences between this case and *Ferguson*,
> both of which defeat [the] defendant's reliance on that decision. The policy here
> covers the *business* described as "farming operations." Therefore, the objective
> described in *Ferguson* of excluding business risks from a *general* liability policy
> is not germane to the meaning of the physical control exclusion in the
> circumstances of this case. Indeed, as [the] plaintiffs argue, [the] defendant's
> assertion that the exclusion applies to all injuries to horses that are under [the]
> plaintiffs' care in connection with the performance of their business would nullify
> the coverage provisions of the policy and the purpose for which it was issued and
> obtained.
>
> The second distinction is that the exclusion here only refers to property
> under the insured's "physical control." As explained in *Ferguson*, "control" and
> "physical control" exclusions are widespread in the industry and have distinct
> purposes. [460 P.2d at 344-46]. It must be assumed that [the] defendant meant to

exclude exactly what it said it did—damage to property under the "physical control" of the insureds, and not property which is merely under their "care, custody or control." In that context, "physical control" must mean a different and more direct kind of control than would the word "control" standing alone. It follows, as the trial court concluded, that the horse could be under [the] plaintiffs' care without being under their physical control for purposes of the exclusion and for purposes of [the horse's owner's] action [against the plaintiffs]. We reject [the] defendant's first assignment.

*Id.* at 312-13 (simplified).

It is clear that *Garvison* involved different facts and policy terms. This case does not concern only the term and potential ambiguity of "physical control" or a "farm liability" insurer or a horse's injuries. Rather, this case involves an insured who paid $42,919.00 in premiums for risks associated with "real estate property managed" and whose policy excludes coverage for "property damage" to "personal property in the care, custody or control of the insured[.]" (Weingold Decl. Ex. B at 10, 17) (caps omitted). It also concerns an extensive scope of damage across property that third parties own. (*Id.* Ex. A at 1-36.) Thus, to the extent that Colony relies on *Garvison* to claim that exclusion j.(4) is valid, enforceable, and unambiguous (*see, e.g.*, Pl.'s Resp. at 25 & n.97; *see also* Pl.'s Reply at 7 & n.35), Colony fails to satisfy its burden.

The remaining case upon which Colony relies is the Oregon Supreme Court's decision in *Crist*. The plaintiffs in *Crist* were partners who were "engaged in the logging business" and sued for negligently damaging an individual's "mobile shovel loader." 413 P.2d at 408. The plaintiffs' policy provided that their insurer "agreed to 'pay . . . all sums which the insured shall become legally obligated to pay . . . because of injury to or destruction of property, including the loss of use thereof, caused by accident.'" *Id.* In rejecting the plaintiffs' tender of their defense and refusing to indemnify the plaintiffs, the insurer relied on the policy's exclusion for "injury to or destruction of property 'controlled by the named insured, property in the care, custody or control

of the insured or property as to which the insured for any purpose is exercising physical control.'" *Id.*

On review, the Oregon Supreme Court explained that "provision of the [plaintiffs'] policy excluding from its coverage injury to property in the care, custody or control of the insured is a common one and has been frequently construed by the court." *Id.* at 410. Immediately thereafter, the Oregon Supreme Court quoted *Couch on Insurance* on "care, custody, or control" exclusions:

> "The great majority of the cases support the view that the exception clause relating to property in the care, custody, or control of the insured refers to possessory handling of the property as distinguished from proprietary control. Stated differently, the concept of 'control' in an exclusion of liability as to property in the 'care, custody, or control' of the insured refers only to the physical fact of possession and does not contemplate proprietary control or ownership."

*Id.* (simplified).

After doing so, the Oregon Supreme Court rested its holding on policy terms that are not at issue here:

> The exclusionary clause here contains a provision not found in any of the cited cases, namely, "property as to which the insured for any purpose is exercising physical control." Identical language was construed by the [Iowa Supreme] [C]ourt in *P & M Stone Co. v. Hartford [Accident & Indemnity Co.,* 100 N.W.2d 28 (Iowa 1959)]. The insured in that case damaged a bulldozer which he was attempting to operate without the consent of the owner, just as . . . [the] plaintiffs' employee [here] . . . was [allegedly] attempting to operate the loader without the consent of [the mobile loader's owner]. The [Second Circuit's previously cited] case was considered by the Iowa [Supreme] Court [in *P & M Stone*, which] . . . held that[] [regardless of] whether [it was correct that] the construction of the phrase "care, custody, or control" [w]as . . . applicable to a trespasser, . . . the provision respecting property[] "as to which the insured for any purpose is exercising physical control" was applicable and the loss, therefore, was not covered. . . .
>
> . . . .
>
> We agree with the Iowa [Supreme] Court that under the provision excluding from coverage injury to property "as to which the insured for any purpose is exercising physical control," it is of no consequence that the insured

acted without the consent of the owner of the property. Hence, we hold that the
complaint in the [underlying] case failed to state a claim against the present
plaintiffs covered by the policy, and the defendant insurance company was,
therefore, under no obligation to defend the action. We express no opinion
whether the "care, custody, or control" provision applies where the insured takes
possession of property without the consent of its owner.

*Id.* at 411 (simplified).[21]

Colony relies on *Crist*'s discussion of policy provisions regarding the "care, custody and
control of the insured," arguing that it "unambiguously refers to mere possessory handling of the
property, and does not require proprietary control or ownership." (Pl.'s Resp. at 25 & n.98, citing
*Crist*, 413 P.2d at 410.) This portion of the *Crist* decision, however, appears to be dicta, as it
preceded the Oregon Supreme Court's discussion of the phrase "property as to which the insured
for any purpose is exercising physical control." *See* 413 P.2d at 410-11; *cf. Gage*, 842 P.2d at
786 & n.3 (addressing an exclusion of coverage for "any property damage to any property you
rent, own, have charge of or are transporting" and rejecting the plaintiff's reliance on *Crist*, in
part because "the discussion of 'in charge of' in [*Crist*] . . . was *dictum*" (citing *Crist*, 413 P.2d at

_____

[21] After quoting *Couch on Insurance*, the Oregon Supreme Court in *Crist* also cited
"[i]llustrative cases, in [terms] o[f] their facts, . . . and holding that the provision regarding care,
custody and control of the insured[] was applicable and barred recovery by the insured[.]" 413
P.2d at 408 (simplified). The cases that *Crist* cited are factually distinguishable and, unlike this
case, involved clearly defined scopes of damages. *See id.* (first citing *Int'l Derrick & Equip. Co.
v. Buxbaum*, 240 F.2d 536, 537-39 (3d Cir. 1957) (an insured agreed to move machinery from a
building and, in doing so, the insured's employees and maintenance company negligently
damaged the elevator and its "equipment," which rendered "portions of the premises"
"unavailable for rental"); then citing *Hardware Mut. Cas. Co. v. Mason-Moore-Tracy, Inc.*, 194
F.2d 173, 174-76 (2d Cir. 1952) (an insured's equipment failed and negligently damaged an
antenna mast, which the insured agreed to raise for a company contracted to procure and install a
metal tower and mast for a broadcasting company); then citing *S. Birch & Sons Constr. Co. v.
United Pac. Ins. Co.*, 324 P.2d 1073, 1073-74 (Wash. 1958) (a carrier used a rental company's
barge to transport the insureds' equipment, the relevant parties' contracts "determined their
responsibility regarding each phase," and the insureds' "master mechanic" negligently damaged
the barge during the "unloading operation," which was the insureds' "responsibility"); and then
citing *Madden v. Vitamilk Dairy, Inc.*, 367 P.2d 127, 128-29 (Wash. 1961) (an insured's
employee pumped and negligently damaged a tanker truck parked at the insured's "unloading
area")).

410-11)); *Ferguson*, 460 P.2d at 345 & n.1 (noting *Crist*'s holding rested on the *P & M Stone* decision).

Three years after issuing the *Crist* decision, the Oregon Supreme Court revisited that case in *Ferguson*. In *Ferguson*, the insured "employed a laborer to clean brush off the back of his lot," and the laborer ended up "clear[ing] beyond the [unmarked property] line and in doing so cut down the [neighbors'] trees." 460 P.2d at 344. The insured "did not exercise any direct control over the workman . . . [or] know that a trespass was being committed" and died shortly before the neighbors sued his estate claiming that he "cut four trees on their property." *Id.* The insured's estate later filed an action against the insurer who denied its duty to defend or indemnify based on the policy's exclusion of "damage to property used by, rented to or in the care, custody or control of the insured or property as to which insured for any purpose is exercising physical control." *Id.*

On appeal, the Oregon Supreme Court addressed the parties' coverage dispute and the trial court's holding that *Crist* controlled because the insured's "employee was exercising physical control over the property damaged and therefore the case fell within the clause of the policy excluding 'property damage to . . . property as to which insured for any purpose is exercising physical control.'" *Id.* The Oregon Supreme Court disagreed and reversed. *Id.* at 349. In so holding, the Oregon Supreme Court addressed its *Crist* decision and interpreted, and addressed the history underlying, the exclusion upon which the insurer and trial court relied:

> In the present case, as in *Crist*, the damage to the property arose out of a trespassory invasion by the insured. It is argued, however, that the conduct of [the insured's] employee did not amount to possession or control of the land but merely the infliction of an injury upon it. To appraise this argument it is necessary to consider the purpose which the exclusion clause was intended to serve.
>
> The reason for adopting this type of exclusion clause is not entirely clear. The first part of the clause excluding coverage as to damage to property in the "care, custody or control of the insured["] has long been a standard part of the

general liability policy. One purpose of this clause was to avoid the "adverse selection of risks." Those buying insurance often seek coverage for certain types of losses common to their particular enterprise. The underwriters felt that the premium of a general liability policy should not be burdened with these special risks; separate policies with appropriate premiums for the risks involved are available. Another reason given for the "care, custody and control" provision is the "moral hazard" involved when property which has been entrusted to the insured's care, custody or control is injured; the insured "feels morally responsible for any damage caused by him and is more interested in seeing the owner is generously compensated by his company."

In the interpretation of the "care, custody and control" provision as it originally appeared in standard policies the courts held that if the insured did not have [c]omplete dominion and the [l]egal right to control the damaged property the exclusion clause would not apply. To avoid this interpretation the insurers added the clause "or property as to which the insured for any purpose is exercising physical control." Although the latter clause is interpreted as extending the exclusion to cases in which the insured's possession is wrongful, it is still necessary to show that the insured was "exercising physical control" before the clause is operative.

There remains, however, the crucial question: What kind of control is contemplated under this clause? The answer is not to be found in an abstract analysis of the word "control." We must turn to the reasons for the adoption of the exclusion clause and . . . determine whether in light of those reasons the policy was intended to exclude coverage in the circumstances of the particular case. We have mentioned the "moral hazard" as one of the factors considered in adopting the exclusion clause. That factor would not be present in the case at bar because [the insured] did not take charge of [the neighbors'] property under circumstances which would generate a feeling of moral responsibility to reimburse him for damage caused to it. It has been observed that one of the purposes in the adoption of the exclusion clause in a general liability policy was to eliminate from coverage the ordinary business risk of damaging property, whether owned by the insured or others, which was used or otherwise involved as a usual incident of carrying on the insured's business. Thus[,] the holding in *Crist* that the damage fell within the exclusion clause can be explained on the ground that the shovel loader was a piece of equipment ordinarily used in carrying on a logging operation. The damage to [the neighbors'] property did not arise out of any business activity carried on by [the insured]; he was simply attempting to clear the brush off the back of his lot.

But the exclusion clause is in broad terms and does not by its terms, at least, purport to exclude business risks only. Can we say, then, that [the insured's] non-business activity in clearing the brush on [the neighbors'] land constituted an exercise of control over the property within the meaning of the policy. We think not.

We interpret the phrase "property as to which the insured for any purpose is exercising physical control" to mean property over which the insured assumes control, knowing that it belongs to another. Where the insured knowingly assumes control over another person's property, either with or without permission, there are reasons for excluding coverage. But we are unable to think of any valid reason for excluding coverage where the insured, while engaged in a non-business activity, unwittingly exercise control over another person's property and in the course of doing so damages it.

If our interpretation of the exclusion clause does not comport with the purpose which [the] defendant insurance company intended it to serve, then we would say only that our reading of the clause was made possible by the defendant's employment of ambiguous language in drafting its policy.

*Id.* at 345-46 (simplified).

In responding to Colony's claim that exclusion j.(4) is unambiguous, Vacasa relies on *Ferguson*'s suggestion that where, as here, a "care, custody and control" provision appears as it "originally appeared in standard policies"—i.e., unaccompanied by the clause "or property as to which the insured for any purpose is exercising physical control"—Oregon courts would continue to interpret this provision as inapplicable unless the insured had "'[c]omplete dominion . . . and the [l]egal right to control the damaged property' at issue." (*See* Def.'s Resp. at 10, quoting *Ferguson*, 460 P.2d at 345.) Vacasa also relies on non-binding authorities holding that the phrase "care, custody or control" is ambiguous. (*See* Def.'s Mot. at 20-21; Def.'s Resp. at 11, collecting cases, including cases from Florida, Illinois, and Wisconsin and an unpublished 1995 decision in which the Ninth Circuit applied Washington law; Def.'s Reply at 23 n.21, agreeing that the Court "should not rely" on the unpublished, pre-January 1, 2007 Ninth Circuit decision).

Colony counters that Vacasa fails to "cit[e] any supporting precedent from either Oregon or the Ninth Circuit," "does not cite or otherwise substantively address" Colony's reliance on *Crist*, *Garvison*, *Stack Metallurgical Services*, and *Artisan*, and otherwise cites cases that Colony finds "distinguishable on their facts" or "did not engage in *any* analysis of the 'care, custody or

control' exclusion at issue in th[e] case." (Pl.'s Resp. at 25-26 & n.100; Pl.'s Reply at 7-8.) Colony adds that the portion of *Ferguson* upon which Vacasa relies is dicta based on a "1963 journal article on automobile liability insurance policies[.]" (Pl.'s Reply at 5); *cf. Artisan & Trucker Cas. Co.*, 2022 WL 420939, at *1, *4 (addressing a "commercial automobile policy" at the default judgment stage and absent any competing interpretations of the care, custody or control exclusion).

Colony's criticisms of Vacasa's supporting authorities apply equally to the cases upon Colony relies. That is significant considering that Colony is the party that filed this declaratory judgment action and must prove lack of coverage. *See Houston Specialty Ins. Co.*, 2020 WL 362641, at *1-2 (holding that in an insurer's "declaratory judgment action, the burden is on the insur[er] . . . to prove lack of coverage" (first citing *United Pac. Ins. Co.*, 527 P.2d at 261; and then citing *QBE Ins. Corp.*, 58 F. Supp. 3d at 1144)). The Court concludes that Colony has not met its burden.

Exclusion j.(4) precludes coverage for "property damage" to "personal property in the care, custody or control of the insured[.]" (Weingold Decl. Ex. B at 10, 17) (simplified). The recent update to the *Couch on Insurance* treatise (i.e., the same treatise that the Oregon Supreme Court cited nearly sixty years ago in *Crist*) provides that "[t]here is significant disagreement over whether the phrase 'care, custody, and control' is ambiguous." 9 Jordan R. Plitt, Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, *Couch on Insurance* § 126:20 (3d ed. June 2025 update) (emphasis added). As it currently stands, "[s]everal courts have held that there is no ambiguity in the phrase and . . . no need to interpret it to mean anything other than what it says[,] [but] [t]here is also considerable authority that the phrase is fraught with ambiguity, and hence, the ambiguity would be resolved in favor of coverage." *Id.* & nn.2-3 (simplified) (collecting

cases); *see also Maher Bros., Inc. v. Quinn Pork, LLC*, 512 S.W.3d 851, 855 (Mo. Ct. App. 2017) (quoting *Couch on Insurance* on the "significant disagreement" over this phrase's ambiguity); *Thomas Mach., Inc. v. Everest Nat'l Ins. Co.*, 571 F. Supp. 3d 1326, 1337 n.14 (S.D. Fla. 2021) (same).

As judges from this district have previously emphasized, "the Oregon Supreme Court [has advised that] . . . 'conflicting judicial decisions as to the proper construction of a clause in an insurance policy are evidence, although not necessarily conclusive, that the clause is ambiguous.'" *Wakeman ex rel. Ensbury v. Eagle W. Ins. Co.*, No. 3:21-cv-00200-SI, 2022 WL 3755206, at *1 (D. Or. Aug. 30, 2022) (first quoting *Jones v. Ins. Co. of N. Am.*, 504 P.2d 130, 133 n.1 (Or. 1972); and then citing *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 923 P.2d 1200, 1218 (Or. 1996)); *see also St. Paul Fire & Marine Ins.*, 923 P.2d at 1218 (noting that "[t]he very fact that a number of courts have reached conflicting conclusions as to the interpretation of a certain provision is frequently considered evidence of ambiguity" (quoting John Alan Appleman and Jean Appleman, 13 *Insurance Law and Practice* § 7404 (1976))).

In responding to Vacasa's reliance on *Ferguson*, Colony argues that the "circumstances at issue in *Ferguson* are very different from the instant case," and that *Ferguson* "did not hold," as Vacasa "suggests" in its opposition, that exclusion j.(4) "only applies when a policyholder has 'complete dominion over and the legal right to control the damaged property at issue.'" (Pl.'s Reply at 6.) Colony argues that *Ferguson* "interpreted the phrase 'property as to which the insured for any purpose is exercising physical control' to mean 'property over which the insured assumes control, knowing that it belongs to another,'" "recognized that the 'care, custody, and control' exclusion applies '[w]here the insured knowingly assumes control over another person's

property, either with or without permission,'" and simply "held that the exclusion did not apply under the circumstances at issue in that case, because the [Oregon Supreme] [C]ourt was 'unable to think of any valid for excluding coverage[.]'" (Pl.'s Reply at 6, quoting *Ferguson*, 460 P.2d at 346.)

Vacasa's policy does not include the above-referenced clause (i.e., "property as to which the insured for any purpose is exercising physical control"), which, according to *Ferguson*, "insurers added" to the "'care, custody and control' provision [that] . . . originally appeared in standard policies" because the insurers wanted to "avoid" courts interpreting the provision as inapplicable unless the insured had "[c]omplete dominion and the [l]egal right to control the damaged property[.]" 460 P.2d at 345 (interpreting absent clause and describing this history). Colony dismisses this passage as dicta based on a "1963 journal article on automobile liability insurance policies" (Pl.'s Reply at 5) but it is relevant to Colony's arguments regarding *Ferguson*.

Colony also suggests that *Ferguson*'s precedential value is "questionable" because it predates and, therefore, did not follow the *Hoffman* methodology for policy interpretation. (*Id.* at 6 n.30.) The same can be said about Colony's reliance on *Crist*, which predates *Ferguson*. Like this Court, however, *Crist* turned to *Couch on Insurance* for the current state of the law. (*See* Pl.'s Resp. at 25 & nn.97-98; Pl.'s Reply at 6 n.26, quoting *Crist*'s passage from *Couch on Insurance*).

Further, *Crist*'s holding rested on the Iowa Supreme Court's construal in *P & M Stone* of the clause "property as to which the insured for any purpose is exercising physical control." 413 P.2d at 411 (noting that this "provision [was] not found in any of the cited cases" but *P & M Stone* "construed" "[i]dentical language"); *Ferguson*, 460 P.2d at 345 & n.1 (noting *Crist*'s

holding rested on the *P & M Stone* decision). In *Connie's Construction Co. v. Fireman's Fund Insurance Co.*, 227 N.W.2d 207, 211 (Iowa 1975), the Iowa Supreme Court addressed its *P & M Stone* decision because the appeal concerned the "same exclusion." *Id.* Like *P & M Stone*, the insurance policy "exclude[d] liability for property damage to 'property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control[.]'" *Id.* The Iowa Supreme Court held that the exclusion was inapplicable because the plaintiff did not have "care, custody, or control" or "physical control" of the "damaged *part* of the building within the meaning of the exclusion[.]" *Id.* at 210-11 (emphasis added). The Iowa Supreme Court also observed that "[a]pplicability of the exclusion has usually been denied when a subcontractor's work on real estate is involved." *Id.* at 211 (citing *Royal Indem. Co. v. Smith*, 173 S.E.2d 738, 739 (Ga. Ct. App. 1970)); *cf. Royal Indem. Co.*, 173 S.E.2d at 739 ("[T]he cases . . . ride off in all directions. Some patterns have emerged, however. Where real property is involved, the courts have been very reluctant to find care, custody or control in repairmen or subcontractors who have been engaged to work on only a portion of a structure. At the other extreme, where there is a clear bailment of chattels, care, custody or control is nearly always found.").

Other courts have similarly recognized that the relevant exclusion may only apply to specific areas, as opposed to "other components of [the subject] property." *See Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 370-71 (5th Cir. 2008) ("The [p]olicy excludes[] '[p]roperty damage to: . . . (4) [p]ersonal property in care, custody or control of the insured.' In general, only the area being repaired by an insured is considered under Texas law to be in that insured's care, custody or control. . . . Here, therefore, even if one could argue that the IFE/CMS system or electrical system generally was in [the insured's] 'control' during the work

being performed, it does not follow that the entire [a]ircraft was [under the insured's 'control'].");  *cf. Cook v. Admiral Ins. Co.*, 438 F. App'x 313, 318 n.20 (5th Cir. 2011) (noting that unlike *Gore Design*, the plaintiff's case was "simply *not* a situation in which the insured's work was to be performed on a discrete independent component of a whole piece of property, and its defective work on that one component caused damage to other components of the whole property").

These cases' observations are particularly relevant here. Vacasa argues that even when accepting Colony's interpretation of exclusion j.(4), this exclusion is "limited in scope and applies only to specific property Vacasa controlled at the time of the loss," and as a result, does not relieve Colony of its duty to defend. (Def.'s Resp. at 12, 14-15; *see also* Def.'s Reply at 25, "[I]f . . . a single piece of property was not in the maid's physical possession at the time of the fire, then Colony must defend Vacasa."). In the *Quosig* Lawsuit, CFPA and the Quosigs allege and cite experts' identification of damage at the "subject rental property," including some (albeit not "significant[]") damage to a "separate garage to the west of the cabin," which included the kitchen where the maid was "cleaning at the time of the fire," "significant[] damage[]" to the "manual and thermostatically controlled valves" to a water heater, which was located in the cabin's external deck closet, and $85,500.00 damage and repairs to undefined "other structures." (*See* Weingold Decl. Ex. A at 5-7, 14-15, itemizing damages under various coverage parts and listing "[o]ther [s]tructures" separate from the Quosigs' primary "[s]tructural/[r]ebuild" and "[d]welling"; *see also id.* Ex. A at 28, contracting for "vacation rental services for the property located at the [Quosigs' address in] Arnold," California, but defining the property as "the '[h]ome'").

///

PAGE 43 – OPINION AND ORDER

In Colony's view, Vacasa's claim about exclusion j.(4)'s scope is based on a case that did not "engage in *any* analysis of the 'care, custody or control' exclusion at issue in that case," and persuasive authorities that "range in age from [forty-nine] to [sixty-six] years old" and are "distinguishable on their facts" and/or "the applicable law." (Pl.'s Reply at 8, 10) (simplified). Colony then summarily concludes that the damages that CFPA and the Quosigs "allege in the underlying [lawsuit were] not 'merely incidental' to the work that [Vacasa] was hired to do," and that exclusion j.(4) "applies in this case, [because Vacasa] is alleged to have assumed control of the 'subject rental property,' pursuant to a contract and with the express authorization of the owner to manage, maintain, supervise, use, occupy, and perform services on the property." (*Id.* at 10-11.)

Even accepting Colony's interpretation, the Court is unable to conclude that Colony satisfied its burden of demonstrating that exclusion j.(4) applies and relieves it of its duty to defend. The Court could not find in Colony's favor without more information about the damage at the "subject rental property," including to undefined "other structures" located on the Quosigs' land. After all, resolving this issue in Colony's favor would mean that "the exclusion . . . , properly construed, . . . encompasses all of the allegations in the complaint that would otherwise give rise to that duty." *Rogowski v. Safeco Ins. Co. of Or.*, 473 P.3d 111, 115 (Or. Ct. App. 2020) (citing *Bighorn Logging Corp.*, 437 P.3d at 293). In other words, the Court would need to find that the "complaint [does not] provide[] *any basis* for which [Colony] . . . provides coverage,' *i.e.*, . . . the facts in the complaint '[cannot] reasonably be interpreted to include conduct within the coverage of [the] policy.'" *Bighorn Logging Corp.*, 437 P.3d at 293 (quoting *Ledford*, 877 P.2d at 83). The Court cannot make such a finding on the current record.

///

For all of these reasons, the Court denies Colony's motion for summary judgment to the extent that Colony argues that exclusion j.(4) applies and relieves it of its obligation to defend Vacasa in the *Quosig* Lawsuit. The Court grants Vacasa's cross-motion for summary judgment on the same issue. *See Houston Specialty Ins. Co.*, 2020 WL 362641, at *2 (emphasizing that "[i]f *any* of the facts pleaded in the complaint establishes the *potential* for covered liability the insurer must defend[, and that] [a]ny doubt as to whether a defense obligation exists must be resolved against the insurer and in favor of the insured" (quoting *West Hills Dev. Co.*, 385 P.3d at 1060 n.5)); *Bighorn Logging*, 437 P.3d at 295 n.3 (noting that the Oregon Court of Appeals has looked to "foreign jurisdictions when construing other commonly used insurance policy exclusions" before stating that "the fact that other courts ha[d] not come to a consensus on the applicability of th[e] exclusions in similar cases buttresse[d] [its] own conclusion regarding [an] ambiguity").

### b.    Exclusions j.(5) and j.(6)

Colony also moves for summary judgment on the ground that exclusions j(5) and j(6) preclude coverage of the damage that CFPA and the Quosigs allege in their second amended complaint, and thus Colony is not obligated to defend Vacasa in the *Quosig* Lawsuit. (Pl.'s Mot. at 8, 10-11.)

The Damage to Property exclusions j.(5) and j.(6) preclude coverage for "property damage" to:

> (5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

> (6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Weingold Decl. Ex. B at 14, 16-17.) The policy defines "[y]our work" as (1) meaning "[w]ork or operations performed by you or on your behalf[,] and . . . [m]aterials, parts or equipment furnished in connection with such work or operations," and (2) including "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work[,'] and . . . [t]he providing of or failure to provide warnings or instructions." (*Id.*)

Exclusions j.(5) and j.(6) both "'preclud[e] coverage for work in progress' and 'are limited in their application by both time and scope.'" *Houston Specialty Ins. Co.*, 2019 WL 7630791, at *14 (quoting 9A Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, *Couch on Insurance* § 126:20 (3d ed. 2019)). For either of "these exclusions to apply, the claims [in the underlying lawsuit] must arise at the time the insured is actually performing the work on the property." *Id.* (simplified). Furthermore, "[t]hese exclusions will . . . apply only to that 'particular part' of the subject property where the operations were being performed by the insured." *Id.*

The parties' disagreement regarding exclusions j.(5) and j.(6) turns largely on the Oregon Court of Appeals' decision in *Bighorn Logging*. (*Compare* Pl.'s Mot. at 10 & n.30, moving for summary judgment based on exclusions j.(5) and j.(6) and citing only a federal district court decision that predates *Bighorn Logging*, *and* Pl.'s Resp. at 28-31 & Pl.'s Reply at 11-13, arguing that *Bighorn Logging* is distinguishable, *with* Def.'s Mot. at 18; Def.'s Resp. at 2 & n.5, 15-16 & n.12, *and* Def.'s Reply at 18, 30-33 & n.26, cross-moving for summary judgment and arguing that *Bighorn Logging* is "binding authority" that "rejected" Colony's "broad interpretation" of exclusions j.(5) and j.(6), and that Colony relies on persuasive authorities that "predate[]"

*Bighorn*"). Thus, the Court turns first to the Oregon Court of Appeals' decision in *Bighorn Logging*.

In that case, the insured logging company "request[ed] a limited license to use up to three Douglas fir trees . . . as 'tail hold trees' . . . secur[ing] 'yarder lines' in connection with [its] logging operation on [an] adjacent property[.]" 437 P.3d at 290. The tree owner agreed to grant the logging company a limited license after it "explained to [him] that it would use only two or three trees and take specific precautions to ensure that there was no or minimal damage to [his] trees." *Id.* The company, however, ended up "cut[ting] down or severely damag[ing] [eighteen] Douglas fir and alder trees as well as numerous shrubs and small trees on [the owner's] property." *Id.* After the owner filed a timber trespass lawsuit against the logging company and the logging company's insurer denied its duty to defend and indemnify, the logging company sued its insurer for breach of contract alleging the insurer was obligated to defend and indemnify it. *Id.*

As relevant here, the logging company's policy included exclusions j.(5) and j.(6), which respectively "exclude[d] coverage for 'property damage' to 'that particular part of real property on which you . . . are performing operations, if the property damage arises out of those operations[,]' . . . [and] to 'that particular part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it.'" *Id.* The policy similarly defined "'[p]roperty damage' [as] 'physical injury to tangible property, including all resulting loss of use of that property[,]' [and] '[y]our work' as . . . 'work or operations performed by [the insured].'" *Id.* at 291.

On appeal, the insurer argued that "it was not obligated to defend [the insured] in the [underlying] case because exclusions [j.](5) and [j.](6) . . . appl[ied] to the allegations raised in

[the tree owner's] complaint." *Id.* at 294. As a result, the Oregon Court of Appeals needed to "decide whether those exclusions appl[ied]." *Id.* Examining the plain meaning of the exclusions and broader context of the policy as a whole, the Oregon Court of Appeals held that each party offered a plausible interpretation and, therefore, resolved ambiguities concerning potential coverage in the insured's favor:

> We first consider the plain meaning of both exclusions and conclude that each is susceptible to multiple, plausible interpretations, including the interpretations advanced by both parties at summary judgment and on appeal. . . .

> Read together, the "particular part" of the property where the insured is performing its "operations" could plausibly refer to any piece of property where the insured is performing any work at all related to the contracted project (i.e., the [adjacent] logging operation in this case) whether authorized or not. Under that broad reading, exclusion [j.](5) would apply to [the insured logging company's] work on the [tree owner's] property because that work was related to [the insured's] primary operations on the [adjacent] property. But the "particular part" of property where [the insured] is performing "operations" is also susceptible to a narrower reading and could refer only to the specific parts of the property where the insured is under contract to work and the specific project that the insured is under contract to perform on that property. Under that reading, exclusion [j.](5) would not apply to [the insured's] work on [the tree owner's] property[, because the insured] was under contract to perform logging operations on a particular portion of the [adjacent] property and was only incidentally working on the [tree owner's] property. . . .

> Even if we assume that exclusion [j.](5) unambiguously extends to those specific, licensed activities on a third-party's property that are connected to the insured's contracted work, [the tree owner] alleged that [the insured] had damaged his trees when it exceeded the scope of its limited license to use his property. It is ambiguous whether exclusion [j.](5) applies under those circumstances because, as described, it is at least plausible that the terms "operations" and "particular part of real property" encompass only those activities that [the insured] was permitted to undertake within the scope of a contract or license and only on the parts of the property where [the insured] was authorized to carry out that work.

> Exclusion [j.](6) is similarly susceptible to multiple meanings. That exclusion applies to exclude coverage for "property damage" to "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." Under the policy, "your work" means "work or operations" performed by [the insured]. Neither "work" nor "operations" are further defined by the policy. Indeed, nowhere does the policy

indicate whether "your work" is confined to the work [the insured] was specifically under contract to perform or authorized to perform under a limited license from a third party. Thus, the exclusion is ambiguous for the same reason that exclusion [j.](5) is ambiguous; it is unclear whether the terms "work" or "operations" refer only to the insured's primary, contracted operation on the "particular part" of the property under contract or also encompasses derivative or ancillary activities on an adjacent third-party's property, including activities beyond the scope of any limited license that the insured might have to work on that property.

. . . . Neither the immediate context in which the exclusions appear nor the broader context of the policy as a whole point to a single plausible understanding of either exception with respect to their applicability to the allegations in [the tree owner's] complaint. . . . The immediate context is not illuminating because the policy leaves several key terms undefined. The policy also contains numerous other exclusions but none that more specifically describes the scope of the policy in a way that clarifies the scope of the exclusions at issue here.

As to the broader context, nowhere does the policy expressly or impliedly address whether any exclusions are intended to include or exclude property damage resulting from ancillary work performed by the insured on the property of third parties. The policy also does not provide any relevant statements of purpose or other evidence of the parties' intent when they agreed to the exclusions. . . .

In sum, both [the insured] and [insurer] offered plausible interpretations of the language of exclusions [j.](5) and [j.](6) to the trial court at summary judgment. Because ambiguities concerning potential insurance coverage are resolved in favor of the insured, . . . the trial court did not err when it granted [the insured']s motion for summary judgment on [the insurer's] duty to defend and denied [the insurer's] cross-motion on the same issue.

*Id.* at 294-96 (simplified).

In its motion, Colony fails to cite *Bighorn Logging* and instead invites the Court to rely on the district court's pre-*Bighorn Logging* decision in *Ohio Casualty Insurance Co. v. Ferrell Developments LLC*, No. 3:10-cv-00162-AC, 2011 WL 5358620, at *11 (D. Or. July 27, 2011), *findings and recommendation adopted*, 2011 WL 5358592, at * 1 (D. Or. Nov. 7, 2011). (*See* Pl.'s Mot. at 10 & n.30.) In *Ferrell*, the district court relied on persuasive Oregon and Washington case law in finding that exclusions j.(5) and j.(6)'s term "'particular' property is not limited to the specific item the insured is working on at the time of the damage but is more

broadly construed to include the property affected by the services performed by the insured."
2011 WL 5358620, at *11. Colony asks this Court to do the same. (*See* Pl.'s Mot. at 10 & n.30,
citing *Ferrell* in arguing that "[c]ourts interpret these exclusions broadly to include not only the
specific items of property that the insured is working on, but all property affected by the services
performed by the insured).

The Court rejects Colony's reliance on *Ferrell*, which did not have the benefit of and
conflicts with the Oregon Court of Appeals' decision in *Bighorn Logging*. *See Houston Specialty
Ins. Co.*, 2019 WL 7630791, at *16 (You, J.) ("[The insurer] does not cite to this [*Bighorn
Logging*] decision or attempt to distinguish it in any way. Where an Oregon court has held that
the term 'particular part' is ambiguous and susceptible to multiple, plausible interpretations, the
ambiguity must be resolved against [the insurer] and in favor of extending coverage to [the
insured].").

Colony also relies on the district court's more recent decision in *Great Northern
Insurance Co. v. Crown Pine Timber 4, L.P.*, No. 3:18-cv-02104-YY, 2021 WL 38187, at *15
(D. Or. Jan. 5, 2021). (*See* Pl.'s Resp. at 27, 29, 31-32 & nn.106, 118, 131 & 139; Pl.'s Reply at
12 & n. 63.) In that case, the district court stated that although *Bighorn Logging* "found the terms
of the j(6) exclusion were 'susceptible to multiple meanings[,]' [that did] not mean the same
ambiguity exist[ed] [in *Crown Pine Timber*]." 2021 WL 38187, at *19. The district court
explained that the ambiguity identified in *Bighorn Logging* was not presented in *Crown Pine
Timber* because the underlying "claim only allege[d] property damage to [certain] timberlands,
which [was] the insured's primary, contracted operations," and because "[t]here [were] no
allegations of damage to an adjacent third-party's property or any property not under the lease."
*Id.* at *20. Notably, the district court also explained that although "nothing in the allegations

support[ed] the conclusion that [the insured] caused damage on an area it was no longer working on, or that work performed incorrectly on one part of the property damaged some other part," and although "speculation [was] insufficient to trigger the duty to defend," "one [could] imagine amendments to the [underlying claim] that could give rise to this interpretation[.]" *Id.* at *19 (simplified).

Unlike the situation in *Crown Pine Timber*, CFPA and the Quosigs allege in their second amended complaint that the fire started in the cabin's kitchen where Vacasa's "maid" was cleaning and ended up damaging, among other places, undefined "other structures" on the Quosigs' land. (*See* Weingold Decl. Ex. A at 5-7, 14-15, 28, alleging as much and $85,500.00 in damage to undefined "other structures," which may include, but is not necessarily limited to, decks and "[a] separate garage to the west" of "the '[h]ome," and itemizing various damages and coverages and listing "[o]ther [s]tructures" separate from the primary "[s]tructural/[r]ebuild" and "[d]welling"). The Court has no way of knowing whether undefined "other structures" bear any relation to the maid's cleaning services in the kitchen or are governed by the terms of the Quosigs' and Vacasa's VRS Agreement for "vacation rental services for a property located at" a California address but defined as "the '[h]ome[.]'" (*See* Weingold Decl. Ex. A at 28-36, attaching the VRS Agreement governing "the '[h]ome'" and provision of "vacation rental services").

Colony argues that even under *Bighorn Logging*'s "narrow" construction, exclusions j.(5) and j.(6) "apply to damage resulting from . . . activities within the scope of [Vacasa's] contract performed on the property where [Vacasa] was authorized to carry out its operations." (Pl.'s Reply at 12-13.) Contrary to Colony's suggestion, it not clear that CFPA and the Quosigs' alleged damages consist only of "'[p]roperty damage' to . . . [t]hat particular part of real property

on which [Vacasa was] . . . performing operations[.]" (*See* Weingold Decl. Ex. B at 16-17, 46; *cf.*

*id.* Ex. A at 28-36, reflecting Vacasa and the Quosigs entered into the VRS Agreement under

which Vacasa would provide "vacation rental services" at a property defined as "the '[h]ome,'"

and which sets forth terms regarding, among other things, "stays at the [h]ome" and Vacasa's

furnishing of "housekeeping services," marketing of the "[h]ome," and authorization to arrange

"maintenance, repairs, and services for the [h]ome"); *Bighorn Logging*, 437 P.3d at 295 ("It is

ambiguous whether exclusion [j.](5) applies under [these] circumstances because, as described, it

is at least plausible that the terms 'operations' and 'particular part of real property' encompass

only those activities that [the insured] was permitted to undertake within the scope of a contract

or license and only on the parts of the property where [the insured] was authorized to carry out

that work.").

      Nor is it clear that the *Quosig* Lawsuit concerns only "'[p]roperty damage' to . . . [t]hat

particular part of any property that must be restored, repaired or replaced because '[Vacasa's]

work' was incorrectly performed on it." (*See* Weingold Decl. Ex. B at 16-17, 46; *cf. id.* Ex. A at

28-36.) Notably, *Couch on Insurance* provides that exclusions j.(5) and j.(6) "will . . . apply only

to that 'particular part' of the subject property where the operations were being performed by the

insured." *Houston Specialty Ins. Co.*, 2019 WL 7630791, at *14 (citation omitted). Furthermore,

"[w]here an Oregon court has held that the term 'particular part' is ambiguous and susceptible to

multiple, plausible interpretations, the ambiguity must be resolved against [the insurer] and in

favor of extending coverage to [the insured]." *Id.* at *16 (citation omitted); *see also Bighorn*

*Logging*, 437 P.3d at 295 (explaining that because the policy failed to "indicate whether 'your

work' [was] confined to the work [the insured] was specifically under contract to perform or

authorized to perform . . . [,] exclusion [j.(6) was] ambiguous for the same reason that exclusion

[j.](5) [was] ambiguous"); *cf. Associated Indus. Ins. Co., Inc. v. SBE Elec. Contracting, Inc.*, No. 24-4186, 2025 WL 2048987, at *1 (9th Cir. July 22, 2025) (applying California law and holding that the insurer had no duty to defend or indemnify its insured, and emphasizing that the parties did not dispute, among other things, that the insured's "alleged failure to protect the [damaged property and yet to be accepted installation work] was work performed *on* the [damaged property]").

For all of these reasons, the Court denies Colony's motion for summary judgment to the extent that Colony argues that exclusions j.(5) and j.(6) apply and relieve it of its obligation to defend Vacasa in the *Quosig* Lawsuit. The Court also grants Vacasa's cross-motion for summary judgment on the same issues. *See Houston Specialty Ins. Co.*, 2020 WL 362641, at *2 (stating that "[i]f *any* of the facts pleaded in the complaint establishes the *potential* for covered liability the insurer must defend[, and] [a]ny doubt as to whether a defense obligation exists must be resolved against the insurer and in favor of the insured" (quoting *West Hills Dev. Co.*, 385 P.3d at 1060 n.5)).

### c.    The REPM Endorsement

Finally, Colony argues that the *Quosig* Lawsuit "alleges only liability that falls squarely within the exclusion set forth in the [REPM] [e]ndorsement[.]" (Pl.'s Mot. at 8, 11-12; Pl.'s Resp. at 7, 9-11, 13-17, 19-24, defining this endorsement, which includes the provision adding the "Property You Operate or Manage Exclusion," as the "REPM [e]ndorsement"). The Court disagrees.

The REPM endorsement modifies the policy's CGL "liability coverage part" in two ways, including by "add[ing]" the following provision to the "j. Damage to Property" exclusion: "This insurance does not apply to . . . '[p]roperty damage' to . . . [p]roperty you operate or manage or as to which you act as agent for the collection of rents or in any other supervisory

capacity." (Weingold Decl. Ex. B at 52) (simplified). The REPM endorsement also modifies the policy's CGL liability coverage part by "add[ing]" the following "excess insurance" provision to "[p]aragraph 4.b.(1) . . . of Section IV – [CGL] Conditions": "With respect to your liability arising out of your management of property for which you are acting as a real estate manager, this insurance is excess over any other valid and collective insurance available to you, whether such insurance is primary or excess." (*Id.*; *see also id.* at 23-24, setting forth paragraph 4.b.(1) of Section IV).

Colony moves for summary judgment on its duty to defend, arguing that the exclusion that the REPM endorsement adds to the CGL liability coverage part "applies" and precludes "coverage for the liability or damages alleged in the underlying suit." (Pl.'s Mot. at 11.) Colony argues that this is so because "[t]he underlying suit alleges, and the VRS Agreement makes it clear, that Vacasa was managing the rental property at the time of the fire, and was expressly authorized to act as the Quosi[gs'] agent for the collection of rents and for purposes of supervising the rental and housekeeping operations for the rental property." (*Id.*, citing Lauersdorf Decl. Ex. 2 at 2-3, 15, 27-35, i.e., paragraphs two, three, seven, and twenty-three of CFPA and the Quosigs' second amended complaint and the Quosigs' and Vacasa's VRS Agreement; *see also* Pl.'s Reply at 2, citing the "facts [CFPA and the Quosigs] allege[] in the underlying suit, including the contents of the [VRS] . . . [A]greement between [Vacasa] and the Quosigs").

The Court finds Colony's arguments unpersuasive. As with exclusions j.(4) through j.(6), the Court's inquiry turns on whether Colony satisfies its burden of demonstrating that the CFPA and the Quosigs' second amended complaint, and VRS Agreement attached thereto and incorporated by reference, lack *any* facts or basis establishing the *potential* for covered liability

under the policy. *See Rogowski*, 473 P.3d at 115 ("[W]e have said that, if the complaint can reasonably be interpreted to allege any basis that would fall within the policy coverage, then the insurer owes a duty to defend[.]"); *Bighorn Logging Corp.*, 437 P.3d at 293 ("'[T]he insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage,' *i.e.*, if the facts in the complaint 'may reasonably be interpreted to include conduct within the coverage of [the] policies.'" (quoting *Ledford*, 877 P.2d at 83)); *Houston Specialty Ins. Co.*, 2020 WL 362641, at *2 ("If *any* of the facts pleaded in the complaint establishes the *potential* for covered liability the insurer must defend. Any doubt as to whether a defense obligation exists must be resolved against the insurer and in favor of the insured." (quoting *West Hills Dev. Co.*, 385 P.3d at 1060 n.5)).

Colony has not met that burden. The REPM endorsement adds an exclusion for "property damage" to (1) "property" that Vacasa "operate[d] or manage[d]," or (2) "property . . . as to which" Vacasa "act[ed] as agent for the collection of rents or in any other supervisory capacity." (Weingold Decl. Ex. B at 52.) By comparison, CFPA and the Quosigs' second amended complaint alleges $85,500.00 in damage to undefined "other structures," which may include, but is not necessarily limited to, decks and "[a] separate garage to the west" of "the '[h]ome," which was not "significantly damaged[.]" (Weingold Decl. Ex. A at 5-7, 14-15, 28.) CFPA and the Quosigs' second amended complaint also attaches as Exhibit A, relies extensively on, and quotes Vacasa and the Quosigs' VRS Agreement. (*Id.* at 2-4, 9-36.) The VRS Agreement reflects that Vacasa would provide "vacation rental services for the property located" at a California address but defined only as "the '[h]ome,'" and sets forth terms regarding, among other things, "stays at the [h]ome" and Vacasa's furnishing of "housekeeping services," marketing of the "[h]ome," and

PAGE 55 – OPINION AND ORDER

authorization to arrange "maintenance, repairs, and services for the [h]ome." (*Id.* at 27-36) (simplified).

It would be unreasonable to interpret these facts as foreclosing *any potential* basis for covered liability. Colony fails to demonstrate that Vacasa "operate[d]," "manage[d]," or agreed to terms regarding undefined "other structures" beyond or separate from "the '[h]ome'" like "a separate garage to the west," that the Quosigs authorized Vacasa and guests to access or use any and all structures for vacation rental purposes, or that the property included no areas or structures that the Quosigs prevented Vacasa and guests from accessing or reserved for their own purposes. Without more, the Court cannot find that the *Quosig* Lawsuit involves only "property damage" to "property" that Vacasa "operate[d] or manage[d]," or "property . . . as to which" Vacasa "act[ed] as agent for the collection of rents or in any other supervisory capacity." (*See* Weingold Decl. Ex. B at 52; *cf.* Pl.'s Resp. at 21, conceding this exclusion "does not reach [Vacasa's] liability because of . . . 'property damage' to property that [it did] not operate or manage or as to which [it did] not act as agent for collection of rents or in any other supervisory capacity," and thus the "[p]olicy is not illusory"; *but cf.* Pl.'s Reply ay 14, arguing that CFPA and the Quosigs "expressly and *exclusively* allege[] liability for 'property damage' to the 'subject rental property,' i.e.," not just the home but the Quosigs' entire "property" and undefined other structures that Vacasa was purportedly "operating, managing, *and* supervising, and for which [it] was acting as agent for the collection of rents"; Pl.'s Mot. at 8, "The pleadings in the underlying suit allege *only* liability for damages because of 'property damage' to which the insurance *does not apply*."; Pl.'s Reply at 16, arguing that the *Quosig* Lawsuit concerns a "*specific* subset of 'property damage'") (first, third, and fifth emphasis added).

///

PAGE 56 – OPINION AND ORDER

For these reasons, the Court denies Colony's motion for summary judgment to the extent that it argues that the REPM endorsement relieves it of its obligation to defend Vacasa. (Pl.'s Mot. at 2, 8, 11-12.) The Court also grants Vacasa's motion on the same issue.[22] (Def.'s Mot. at 1, 11-12, 22.)

## CONCLUSION

For the reasons stated, the Court DENIES Colony's motion for summary judgment (ECF No. 21) and GRANTS Vacasa's cross-motion for partial summary judgment (ECF No. 23).

**IT IS SO ORDERED.**

DATED this 30th day of September, 2025.

HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[22] Given the findings above, the Court declines to reach the parties' disputes about whether this exclusion precludes "all claims related to," or renders illusory (i.e., completely negates), Vacasa's REPM coverage under the policy. (*See* Pl.'s Resp. at 9; Pl.'s Reply at 15-16; Def.'s Reply at 8-9.)